Cherrye **BRADLEY**, Frances Roy, and Maryann Welch, Plaintiffs,

v.

Pickens **BROWN** and The Kill Company, Defendants.

Civ. No. 2:85 CV 958 JM.

United States District Court, N.D. Indiana, Hammond Division.

May 17, 1994.

Terrance L. Smith, Julie R. Fouts, Smith and Debonis, East Chicago, IN, for plaintiffs Cherrye L. Bradley, Frances Roy and Maryann E. Welch.

Thom W. Kramer, Buoscio Pera Kramer and Nowak, Merrillville, IN, for defendants Pickens Brown, The Kill Co., Warren Harrin and U.S. Steel Corp.

### ORDER

MOODY, District Judge.

From November 29, 1993 to December 1, 1993 the court conducted a bench trial in this case. Based on the following findings of fact and conclusions of law, the court now rules in favor of Cherrye Bradley, Frances Roy, and MaryAnn Welch and **ORDERS** the clerk to enter judgment against Pickens Brown and The Kill Company, jointly and severally, in the amounts stated in the conclusion of this decision. To the extent that any finding of fact is subsequently deemed to be a conclu-

sion of law, the court adopts it as such; to the extent that any conclusion of law is deemed to be a finding of fact, the court adopts it as such. *See Miller v. Fenton,* 474 U.S. 104, 113–14, 106 S.Ct. 445, 451–52, 88 L.Ed.2d 405 (1985).

## I. *Findings of facts.*

### A. *Undisputed facts.*

There are few facts undisputed in this controversy. The parties do, however, agree to the following:

At all times relevant to this action, Pickens Brown was the owner and sole operator of The Kill Company. In this capacity, Brown did contract extermination work for U.S. Steel Corporation ["USX"] at its Gary Works plant in Gary, Indiana. Responding to repeated employee complaints about insect bites in the file room of the Accounts Payable Building at the Gary Works plant, Brown applied pesticides to the file room on April 20, 1983. Brown conducted the application in the file room between 6:00 a.m. and 6:30 a.m.

Prior to applying the pesticides, Brown sealed the room. The room itself has three entrances: two have doors, the third does not. Brown taped plastic garbage bags over the entrance without the door. When Brown finished the pesticide application, which included fogging the room, he left the Gary Works facility. An air circulation system was then activated. That system recirculated the air within the building, rather than moving the air outside.

Within an hour after the application was completed, employees who had begun arriving to work at the building became nauseous and displayed other symptoms of pesticide exposure. In all, 33 employees, including Roy, Bradley, and Welch had to be treated at the U.S. Steel dispensary. All were given blood serum cholinesterase and other tests to determine what was causing their symptoms. All 33 employees were released later the same day.

### B. *The court's findings of fact.*

The court makes the following findings of fact based on its determination of the various

witnesses' credibility and on other evidence, as noted:

The court finds Brown's testimony concerning the pesticide application largely credible. It finds the following facts based on that testimony.

In April 1983, Brown received several calls from USX relating that women working in the file room of the Accounts Payable Building were being bitten by unseen insects. He sprayed the file room with pesticides on more than one occasion in order to eliminate the culprit insects. On April 19, 1983, Brown met with Steve McFatridge, a supervisor in the accounts payable department at USX. McFatridge told Brown that if Brown could not rid the file room of the insects, USX would take the job to Orkin, one of Brown's competitors. Brown assured McFatridge that he could do the job. Brown expressed his desire to do so on a Saturday, when the Accounts Payable Building would not be in use. McFatridge, however, told Brown that union rules would make it difficult to have someone at the building to let Brown in on a Saturday. He suggested a weekday morning. He assured Brown that the file room would be ventilated prior to any employees arriving for work. Ultimately, Brown agreed to do the application the next day.

Pursuant to his meeting with McFatridge, Brown showed up at the Accounts Payable Building on April 20, 1983 sometime near 6:00 a.m.. As he had done on at least one of his prior visits, Brown made a crack-and-crevice application using Diazinon 4E, an organophosphate pesticide. A crack-and-crevice application involves spraying the diluted Diazinon along the baseboards and in the corners of the room. Brown also sealed the file room, as described above, and fogged it using Pyrtox, a pesticide composed primarily of pyrethrins and mineral oil, in a kerosene base.

The plaintiffs maintain that Brown fogged with Diazinon. The court's finding that Brown did, in fact, fog the file room with Pyrtox, in a kerosene base, is founded upon:

- Brown's credible testimony that he fogged with Pyrtox,
- Brown's credible testimony that the Diazinon 4E he used for the crack-and-crevice application was water, not oil, soluble and that the fogging machine he used cannot fog water-based pesticides,[1]
- Toxicologist Joanne Cardiff's testimony that reduction of blood serum cholinesterase is the first sign of Diazinon exposure and that the serum cholinesterase levels measured in the 33 exposed individuals in this case was not sufficiently reduced to indicate exposure.
- Dr. Alfred R. Johnson's testimony that the Diazinon screening test given Roy on April 20, 1983 was negative. Ex. NN at 31–32 (Johnson deposition).
- Cardiff, Dr. Richard L. Lipsey, see Ex. 22 at 129 (Lipsey deposition), and Dr. Tevor Novak's testimony that the primary symptoms (headache, breathing difficulties, dizziness, and nausea) displayed by those in the Accounts Payable Building on April 20, 1983 are consistent with exposure to Pyrtox in a petroleum distillate carrier, i.e. kerosene and mineral oil.

The court finds this testimony more persuasive than the contrary evidence offered by the plaintiffs. Perhaps most importantly, in the war of experts the court finds Cardiff's explanation of events more credible than that offered by Lipsey. For example, the court accepts Cardiff's opinion that inhaled Diazinon would inhibit blood-serum cholinesterase rather than Lipsey's that inhaled Diazinon would not act as a blood-serum cholinesterase inhibitor.

The court also rejects plaintiffs' effort to undermine Brown's credibility with the testimony of Margaret Hill, the janitress in the Accounts Payable Building. Hill let Brown into the building on April 20, 1983. Hill testified that she did not recall seeing Brown with any sprayer that could be used for a crack-and-crevice application. Hill's testimony is inconclusive, however; she stated

---

1. Brown acknowledged that other formulations of Diazinon are oil soluble; it is, however, Diazinon 4E that is at issue in this case.

frankly that she did not observe all of Brown's activity in the building. Accordingly, she cannot speak with authority about what Brown did not do.

Finally, the court gives short shrift to the probity of the statement attributed to Brown in the USX accident report filed the day after the incident. In that report, Brown is reported to have said that he "decided to fumigate the file room using a fogging machine and a concentration of Diazinon ... in a kerosene base." Ex. 1 at 1. Brown denied that he made this statement. Brown asserted that he would not have used the term "fumigate," which he stated has a very different meaning among pesticide applicators than does "fog." He emphatically denied telling anyone at USX that he fogged with Diazinon. The writer of the report did not testify. The court finds Brown's denial of the report credible.

The directions for Pyrtox state that the applicator should

> [c]lose windows and doors and shut off ventilating systems.... Keep the area closed for at least 15 minutes. Vacate the treated area and ventilate before reoccupying.

Ex. B–1. It is undisputed that the file room was sealed and no ventilation was operating during the fogging. Brown testified that McFatridge told him that the building could be ventilated after the procedure. Brown testified that there was another man, a USX employee, present in the building and that he assumed that this man would turn the ventilation on when he left. Brown testified that he did not know whether the ventilation fans were on when he left at around 6:30 a.m.. He testified that he relied on USX to assure the building would be properly ventilated. The court accepts this testimony as credible.

It is, as noted, undisputed that the purported ventilation system in fact recirculated the air in the Accounts Payable Building. This spread the Pyrtox fog about the building rather than removing it. Consequently, when employees arrived at the building sometime after 7:00 a.m. they were exposed to airborne Pyrtox in a kerosene base.

Bradley, Roy, Welch, and Elizabeth Larsen, another employee at the Accounts Payable Building on April 20, 1983, each testified to what happened next. The court finds their testimony in this regard credible.

Roy arrived first among these. Notwithstanding the fact that she noticed a odiferous mist in the air inside the building, she sat at her desk and poured and drank a cup of coffee. She then began to feel nauseous. Her chest was hot. Her eyes watered. She went outside to get some air, but then returned again to the building. She soon left the building again, and this time she "blacked out." When Larsen arrived, Roy was standing in the building's foyer. Larsen thought Roy "looked bad": Roy was pale and gasping.

Larsen entered the building. There was a haze inside and her eyes stung. She was nauseous and, after entering and leaving the building several times, she vomited.

Bradley arrived at the Accounts Payable Building around 8:00 a.m.. There was a group of employees gathered outside. She saw Roy passed out. She saw Welch pacing back and forth outside the building. Bradley nonetheless entered the building at the direction of a union "grievance person." She testified that a mist still hung in the air, but that fans were now on. People were standing around the room, but no one was working. Bradley, who was pregnant, sat at her desk. Eventually, the "grievance person" directed her to leave the building and she was taken by ambulance to the dispensary. She felt nauseous and vomited both in the ambulance and at the dispensary.

Welch had the least reaction to the exposure among the plaintiffs. She worked in the building for two-and-a-half hours on April 20, 1983. She did go outside to get air periodically, and she did go to the dispensary because she was not feeling well around 10:00 a.m.

With regard to harm suffered, the court finds that all three plaintiffs suffered nausea and severe discomfort on the day of the incident. All three joined the other Accounts Payable Building employees at the dispensary and they each visited Dr. Pamela Carter

to follow up on that visit. There is no evidence that the visit to Dr. Carter cost the plaintiffs money. All three missed work, but there was no evidence that they lost wages in the days immediately following the incident. Roy and Bradley presented additional evidence of substantial medical and missed-work expenses. These expenses relate to their claim of having contracted a disorder known as multiple chemical sensitivity as a result of the April 20, 1983 exposure.

## II. *Conclusions of law.*

Bradley, Roy, and Welch invoke the court's diversity jurisdiction in alleging negligence against Brown. The parties agree that Indiana state-law governs their dispute. *See Kutsugeras v. Avco Corp.,* 973 F.2d 1341, 1346 (7th Cir.1992) (in diversity action, federal court applies appropriate state law). Indiana's law-of-negligence requires that a plaintiff establish, by a preponderance of the evidence, that: (1) the defendant owed them a duty, (2) that the defendant failed to conform his or her conduct to a standard consistent with that duty, (3) that such failure (a) proximately caused (b) the plaintiffs' compensable injuries. *See Webb v. Jarvis,* 575 N.E.2d 992, 995 (Ind.1991). The plaintiffs here have succeeded in establishing these elements with regard to some, but not all, of their claimed injuries.

### A. *Duty.*

■ Whether Brown owed plaintiffs a duty of care is a question of law in Indiana. *See Webb,* 575 N.E.2d at 995. Duty exists "where reasonable persons would recognize it and agree that it exists." *Stump v. Commercial Union,* 601 N.E.2d 327, 332 (Ind. 1992). Reasonable persons recognize a duty to conform their actions to avoid the risk of injury to others. This idea is incorporated into the Indiana Supreme Court's formulation of the inquiry into duty in terms of: (1) the relationship between the parties, (2) the reasonable foreseeability of harm, and (3) public policy. *See id.*

■ Where, as here, the parties do not argue, and the court does not detect, any special relationship between the parties that would give rise to a duty of care, the court's focus is "on whether the type of harm actually inflicted was reasonably foreseeable." *See Webb,* 575 N.E.2d at 997. Based on the undisputed toxicity of both Pyrtox and Diazinon, the court concludes that it is foreseeable that misapplication of those pesticides would result in injury to employees who would be arriving in the Accounts Receivable Building less than an hour later. It is all but self-evident that Indiana public policy would mandate that Brown conform his conduct to avoid that injury. Accordingly, the court concludes that Brown did have a duty to conform his application to a standard that would avoid injury to the U.S. Steel workers employed in the Accounts Receivable Building.

### B. *Breach of duty.*

■ Having concluded that Brown owed a duty of reasonable care to the U.S. Steel employees in the Accounts Payable Building on April 20, 1983, the court also concludes that Brown breached that duty. Put another way, the court concludes that Brown was negligent. *See* W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 30, at 164 (5th ed. 1984) (The elements of duty and breach of duty "usually have [been] called negligence.") ["PROSSER AND KEETON"].

Brown did not conform his conduct to minimize risk to the workers in the Accounts Payable Building. The court concludes that it was unreasonable to fog in the morning prior to the arrival of the workers. Brown's own testimony—that he warned McFatridge of the dangers of fogging on a day when employees would be arriving in the building shortly afterwards—bolsters this conclusion. Moreover, Brown's reliance on McFatridge's word that the building would be ventilated, his failure to investigate whether the building could be ventilated, and his leaving the building without assuring himself that the building was ventilated all constitute negligent conduct. It was Brown, as the pesticide applicator, who owed the primary duty to the workers not to apply the pesticides in a manner that put the workers in danger. He failed in this regard.

■ This conclusion is compelled, at any rate, because Brown was negligent *per se* in this regard. Pyrtox's label calls for ventilation subsequent to fogging. Brown did not see to it that the Accounts Payable Building was ventilated. This was a violation of both the United States and Indiana codes, which proscribe the use of any registered pesticide in a manner inconsistent with its labelling. 7 U.S.C. § 136j(a)(2)(G) *and* IND.CODE. § 15–3–3.6–14(b). Brown does not contest that Pyrtox is a registered pesticide to which these sections are applicable. Non-excused or non-justified violation of a statutory duty is negligence *per se* where: (1) the purpose of the statute was to protect the persons injured, (2) from the injuries in fact suffered. *See Inland Steel v. Pequignot*, 608 N.E.2d 1378, 1383 (Ind.Ct.App.1993). Sections 136j(a)(2)(G) and 15–3–3.6–14(b) are designed to protect persons in areas in which pesticides are applied from injuries that result from applications that do not comply with the safety warnings on the labels. Accordingly, Brown's non-excused and non-justified failure to comply with the label's strictures constitutes negligence *per se*.[2]

### C. *Proximate causation and harm.*

Indiana cases discuss the third element of an Indiana negligence claim, as "an injury to the plaintiff proximately caused by the [defendant's] breach [of duty]." *See Webb*, 575 N.E.2d at 995; *see also, e.g., Cowe v. Forum Group, Inc.*, 575 N.E.2d 630, 636 (Ind.1991); *Watson v. Medical Emergency Services, Corp.*, 532 N.E.2d 1191, 1193 (Ind.Ct.App. 1989). This formulation in fact contains two elements of the traditional conception of negligence: (a) proximate cause, and, (b) actual loss or damages. *See* PROSSER AND KEETON, *supra*, § 30, at 164–65. The court treats these elements separately.

### 1. *Proximate cause.*

■ As used in negligence law, causation "is the requirement for a reasonable connection between a defendant's conduct and the damages which [ ] plaintiff[s] ha[ve] suffered." *Cowe*, 575 N.E.2d at 635. The plaintiffs must draw this connection by showing that their injuries were the "natural and probable consequence" of Brown's negligence "which should have been foreseen." *Watson*, 532 N.E.2d at 1194.

■ Drawing this connection is particularly difficult in the growing field of hazardous-substance litigation, where the causal relationship between exposure to a hazardous substance and subsequent symptoms may be hypothesized, but not yet tested and proven to the legally required degree of certitude. *See generally, e.g., Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. ——, ——, 113 S.Ct. 2786, 2796–99, 125 L.Ed.2d 469 (1993) (pre-natal anti-nausea drug, Bendectin, allegedly caused birth defects); *Ferebee v. Chevron Chemical Co.*, 736 F.2d 1529 (D.C.Cir.1984) (herbicide, Paraquat, allegedly caused pulmonary fibrosis in agricultural worker); *In re: Agent Orange Litigation*, 611 F.Supp. 1223 (E.D.N.Y.1985) (chemical defoliant, Agent Orange, allegedly caused health problems in exposed soldiers), *aff'd* 818 F.2d 194 (2d Cir.1987). In such technical cases, "[w]hen the issue of proximate cause is not within the understanding of lay persons, testimony of an expert witness on the issue is necessary." *Watson*, 532 N.E.2d at 1194.

A recent, and relevant, example in the Seventh Circuit is *Porter v. Whitehall Laboratories, Inc.*, 791 F.Supp. 1335 (S.D.Ind. 1992) ["*Porter I*"], *aff'd* 9 F.3d 607 (7th Cir.1993) ["*Porter II*"]. Porter fractured his toe while at work. *Porter I*, 791 F.Supp. at 1337–38. Prior to surgery, he was given the drug ibuprofen to minimize his pain. *Id.* at

---

**2.** Plaintiffs argue that Brown was also negligent *per se* for failing to be certified as a pesticide applicator in Indiana as required by Indiana law. *See* IND.CODE. § 15–3–3.6–3 (1983). This argument misapprehends the negligence *per se* doctrine: "[t]he violation of a statute raises no liability for injury to another unless the injury was in some manner the result of such violation." *Inland Steel v. Pequignot*, 608 N.E.2d 1378, 1383 (Ind.Ct.App.1993). Brown's alleged failure to receive or maintain his certification did not result in the injuries here: plaintiffs' injuries resulted from Brown's failure to exercise due care in applying Pyrtox. Whether Brown was certified or not is not relevant to his failure to exercise due care in this case. An uncertified applicator who in all other respects exercises due care would not be liable in tort for injuries consequent to the application; likewise, a certified, but negligent, applicator would be liable.

1338. Subsequently, Porter suffered renal failure. *Id.* at 1338–39. Whitehall Laboratories manufactured the ibuprofen product Porter was given. *Id.* at 1338. Porter theorized that his renal failure was proximately caused by his ingestion of ibuprofen. *Id.* at 1340. The court, applying Indiana negligence law, concluded that because "[t]he etiology of Mr. Porter's renal failure is dependent upon complex medical interactions that are understood—to the extent they can be understood—only by specialists in the field," that causation could be made out only through expert testimony. *Id.* at 1341. The Seventh Circuit agreed. *Porter II,* 9 F.3d at 612.

■ With regard to the multiple chemical sensitivities ["MCS"] that Bradley and Roy claim they suffer from, the present case is analogous to *Porter.* The etiology of MCS, to the extent it is understood at all, must turn upon complex medical interactions beyond the ken of a lay person, or for that matter the court.[3] Accordingly, as in *Porter,* plaintiffs may not make out causation *vis-a-vis* MCS merely by reliance upon the temporal congruity of the events of April 20, 1983 and the onset of their symptoms. As in *Porter,* "[s]uch a blunt inference cannot provide a reasonably reliable explanation for complex, unseen physiological processes." *Porter I,* 791 F.Supp. at 1341–42 (recognizing, however, that "temporal congruity may be *some* evidence of causation"). Scientific expert testimony is required.

To this end, plaintiffs attempted at trial to have admitted into evidence the depositions of Drs. William J. Rea and Alfred R. Johnson on the subject of MCS. Brown moved *in limine* to exclude Rea's deposition and those portions of Johnson's deposition that concern MCS. The court took Brown's motion under advisement. Because resolution of Brown's motion *in limine* is crucial to whether Bradley and Roy can meet their burden with

regard to causation on their alleged MCS damages, the court discusses the motion *in limine* before reaching the question of causation itself.

**a.** *Brown's motion in limine.*

Brown, as noted, moved at trial to exclude the deposition testimony of Drs. Rea and Johnson with regard to MCS. Expert testimony is admissible where: (1) the witness is qualified as an expert, (2) the testimony reflects "scientific, technical, or other specialized knowledge," and, (3) such testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue." *See* FED.R.EVID 702 (Emphasis added.) Brown does not question either Rea or Johnson's professional qualifications. Rather, the contested issue here is whether Rea and Johnson's testimony about MCS is based upon scientific knowledge. If it is not, then it cannot be helpful to the court.

■ This issue is addressed to the court pursuant to FED.R.EVID. 104(a). *Daubert,* 509 U.S. at ——, 113 S.Ct. at 2796, 125 L.Ed.2d at 482.[4] Plaintiffs, as proponents of the testimony, bear the burden of establishing the testimony's admissibility by a preponderance of proof. *See id.* at —— n. 10, 113 S.Ct. at 2796 n. 10, 125 L.Ed.2d at 482 n. 10. The court determines whether plaintiffs have met this burden by application of Rule 702, as construed by Supreme Court in *Daubert,* to plaintiffs' offer of proof and supporting materials.

*Daubert* discussed the definition of "scientific knowledge," as that expression is used in Rule 702. *Id.* at —— – ——, 113 S.Ct. at 2794–95, 125 L.Ed.2d at 480–81. The Court held that Rule 702 displaced the rule of *Frye v. United States,* 293 F. 1013, 1014 (D.C.Cir. 1923), which had defined "scientific knowledge" as concerning theories or techniques generally accepted in the relevant field. 509

3. WEBSTER's THIRD NEW INTERNATIONAL DICTIONARY 782 (1981) defines "etiology" as:
1 a: a science or doctrine of causation or of the demonstration of causes b: a branch of science dealing with the causes of particular phenomena 2: all the factors that contribute to the occurrence of a disease or abnormal condition.

4. FED.R.EVID. 104(a) provides, in relevant part:
Preliminary questions concerning the qualification of a person to be a witness ..., or the admissibility of evidence shall be determined by the court.... In making its determination it is not bound by the rules of evidence except those with respect to privileges.

U.S. at ——, 113 S.Ct. at 2794, 125 L.Ed.2d at 480. Prior to *Daubert,* as the Seventh Circuit recently pointed out, "the majority of federal courts applied the *Frye* standard to determine the admissibility of scientific evidence." *O'Connor v. Commonwealth Edison Co.,* 13 F.3d 1090, 1106 (7th Cir.1994). *Daubert* held, however, that while " 'general acceptance' can yet have a bearing on the inquiry" into whether a theory or methodology is scientific knowledge, the critical concern under Rule 702 is "evidentiary reliability—that is, trustworthiness." *Daubert,* 509 U.S. at ——, —— n. 9, 113 S.Ct. at 2795, 2795 n. 9, 125 L.Ed.2d at 481, 481 n. 9.

■ A particular scientific theory or methodology is considered "trustworthy," in this sense, when it is scientifically valid. *Id.* This is not to suggest, as Chief Justice Rehnquist warned against, that the court don the amateur scientist's cap in ruling on scientific validity. *See id.* at ——, 113 S.Ct. at 2800, 125 L.Ed.2d at 487 (Rehnquist, C.J., concurring in part, dissenting in part). The court's task is rather more humble: it determines the scientific validity of a theory or methodology by considering, primarily, whether the proffered testimony: (1) can be *and* has been empirically tested, (2) has been published and subjected to peer-review, and, finally, (3) has been generally accepted in the relevant technical community. *See id.* at ——, 113 S.Ct. at 2796–97, 125 L.Ed.2d at 482–83.

The first of these considerations, which asks whether the theory or methodology has been subjected to the scientific method, is the most weighty. *See id.; see also Porter II,* 9 F.3d at 614. Scientific method " 'is based on generating hypotheses and testing them to see if they can be falsified.' " *Daubert,* 509 U.S. at ——, 113 S.Ct. at 2796, 125 L.Ed.2d at 483 (citation omitted). Scientific method " 'is what distinguishes science from other fields of human inquiry.' " *Id.* This distinction justifies the special treatment scientific testimony is given under the federal rules. *See id.* at ——, 113 S.Ct. at 2796, 125 L.Ed.2d at 482 (noting Rules 702 and 703 are lone exceptions to personal knowledge limitations placed on opinion testimony of other witnesses). Specifically, scientific expert opinion testimony is allowed on the rationale that the expert can tie the facts of a particular case to tested scientific theory. *See Porter II,* 9 F.3d at 614. This allows the factfinder to infer that the case before it comports with that theory. *See id.* "If the experts cannot tie their assessment of data to known scientific conclusions, based on research or studies, then there is no comparison for the [fact-finder] to evaluate." *Id.* This explains *Daubert's* focus on scientific method: the court must "rule out 'subjective belief or unsupported speculation.' " *Id.* (quoting *Daubert,* 509 U.S. at ——, 113 S.Ct. at 2795, 125 L.Ed.2d at 481).

■ Turning to the case at bar, the parties have submitted in support and opposition to the motion *in limine* literally hundreds of pages of material discussing MCS. The court has considered these materials in depth. Even relying wholly upon plaintiffs' own exhibits, plaintiffs' fail to establish that the etiology of MCS, accepting *arguendo* that such a clinical entity exists, is known or tested at this point. Accordingly, Drs. Rea and Johnson's opinions regarding whether the plaintiffs' exposure caused their symptoms would be entirely too subjective and speculative.

Rea and Johnson are among a group of doctors and scientists known as "clinical ecologists." Roy and Bradley both testified that they were referred to these doctors for their expertise in MCS.[5] Rea claims to have seen as many as 20,000 "environmentally sensitive" patients at their Environmental Health Center in Dallas, Texas. *See* William J. Rea, *Chemical Sensitivities* Preface (1992) [Ex. 9]. Thirteen percent of those patients "relate the onset of their sensitivity to a severe acute [chemical] exposure." *Id.* at 9. This compares, for example, to the nine percent that "identified childbirth as the triggering event." *Id.* at 9–10. It is based upon those observations that Rea, and presumably Johnson, base their hypotheses about the etiology of MCS.

The problem the court faces here is that Rea and Johnson's opinions about MCS's

---

5. Welch does not claim to suffer from MCS.

causes are, at best, hypothetical at this point. Rea states frankly in his own recent book that: "[W]e do not know at this time the initial mechanism by which good health gives way to chemical sensitivity." Ex. 9 at 47. Accordingly, any opinion that the April 20, 1983 exposure induced MCS in Bradley and Roy would be only slightly diluted speculation. Such a conclusion would necessarily rest on uncontrolled past observations. An example is Rea's statement that soldiers' exposure to mustard gas in World War I and Agent Orange in Viet Nam, and citizens' exposure to cyanate in Bhopal, India after a chemical plant accident there, "all graphically illustrate that chemical sensitivity may be caused by a significant, acute exposure to toxic substances." *Id.* at 9. There is no indication either in Rea's book or in other proofs submitted to the court that the victims of these exposures were even diagnosed with MCS. Rea's contrary conclusion is exempletive of the sort of reasoning that, no doubt, leads many scientists to "dismiss" the work of clinical ecologists as "anecdotal." *See* Nicholas Ashford and Claudia Miller, *Chemical Exposures: Low Levels and High Stakes* 111 (1991) [Ex. 38]. It is a far cry from the tested hypotheses foreseen as the basis of "scientific knowledge" testified to under Rule 702.

Plaintiffs present Ashford and Miller as positive peer review of clinical ecology. Peer review is significant under *Daubert* because "scrutiny of the scientific community is a component of 'good science,' in part because it increases the likelihood that substantive flaws in methodology will be detected." 509 U.S. at ——, 113 S.Ct. at 2797, 125 L.Ed.2d at 483. Ashford and Miller do characterize Rea and Johnson's diagnostic and therapeutic modality, *i.e.* a "comprehensive environmental control with the use of an environmental unit," as "the gold standard." Ex. 38 at 30. That is neither here nor there, however, with regard to the clinical ecologists' hy-

potheses concerning MCS's etiology. To the attack on these hypotheses as anecdotal, Miller and Ashford respond that

> only through observations like these· can patterns be discovered, which in turn suggest a hypothesis, which then leads to experiments to prove or disprove that hypothesis. We are currently [in 1991] at the pattern-recognition stage with regard to multiple chemical sensitivities. Finding a mechanism to explain these patterns lies down the road.

*Id.* at 111. In fact, Miller and Ashford conclude that

> [p]erhaps the mechanism for multiple chemical sensitivities is not identifiable; that is after all avenues of biochemical and immunological inquiry have been exhausted, no single explanation for this disorder is forthcoming.

*Id.* at 124. Miller and Ashford do not suggest that any combination of explanations for MCS is forthcoming either. In fact, consistent with the anecdotal characterization of clinical ecology's work, Miller and Ashford conclude that the "adaptation" process, which Rea hypothesizes as underlying MCS, *see* EX. 9 at 21, "is *only* an observation at this time, not a mechanism." Ex. 38 at 124.[6]

Other evidence proffered by the plaintiffs leads to the same conclusion. For example, Dr. William J. Meggs states that "[a]t the present time, the mechanism of this intolerance of chemicals is as controversial as the syndrome itself." William J. Meggs, *Immunological Mechanisms of Disease and the Multiple Chemical Sensitivity Syndrome* 1 (1992) [Ex. 33]. Meggs notes the "early stage of scientific scrutiny" of MCS and concludes that the etiological model he offers, which is similar to Rea and Johnson's, is "speculative." *Id.* at 12. Dr. Iris R. Bell also stresses the need for "[a]ppropriate research in MCS ... [to] test plausible hypotheses by which a particular factor could caus-

---

**6.** Rea describes "adaptation" as

> an acute survival mechanism which apparently allows an individual to 'get used to' an acute toxic exposure in order initially to survive it.
>
> .    .    .    .    .    .
>
> Over time, adaptation that accompanies continued exposure to toxic substances can result

> in a long-term decrease in efficient functioning that can then lead to diminished longevity....
> Ex. 9 at 21.

ally contribute to or ultimately produce the clinical picture." Iris R. Bell, *Neuropsychiatric & Biopsychosocial Mechanisms In Multiple Chemical Sensitivity: An Olfactory–Limbic System Model* 1 (1992) [Ex. 29]. Bell notes, in the context of discussing the possible psychosomatic bases for MCS that "[p]roper epidemiological research on the characteristics of MCS" is required. Ex. 29 at 4. Plaintiffs present no such epidemiological support in their proffer here. The need for such support is underscored by the fact that

> [t]he symptoms reported and their duration are not consistent with the accepted toxicological properties of the chemicals. That is, the severity and range of symptoms reported are often in excess of those expected based on the exposure information available.

Nancy Fiedler, Clement Maccia, and Howard Kipen, *Evaluation of Chemically Sensitive Patients*, JOM vol. 34, no. 5 at 529 (May 1992) [Ex. 34].

Thus, plaintiffs' own evidence clearly establishes that the "science" of MCS's etiology has not progressed from the plausible, that is, the hypothetical, to knowledge capable of assisting a fact-finder, jury or judge. As *Daubert* recognized, "[t]he scientific project is advanced by broad and wide-ranging consideration of a multitude of hypotheses"; by contrast, "in the project of reaching a quick, final, and binding legal judgment ... about a particular set of events in the past," the court must weed out the speculative hypothesis from the tested theory. 509 U.S. at ——, 113 S.Ct. at 2798, 125 L.Ed.2d at 485. The Court in *Daubert* recognized and accepted that this gate-keeping function "on occasion will prevent the jury [or the court, in a bench trial] from learning of authentic insights and innovations." *Id.* The court recognizes that risk here. Nonetheless, it must answer the question before it based on current knowledge.

The result reflects the balance struck by the Federal Rules of Evidence between the need for expert testimony and the inconstancy of science. That balance requires a district court, as the Seventh Circuit has stressed in each similar case to come before it since *Daubert*, to take seriously its gate-keeping function. *See O'Connor*, 13 F.3d at 1106 (7th Cir.1994) (trial judge must regulate theories about which expert may testify); *Porter II*, 9 F.3d at 613 (same); *Wilson v. City of Chicago*, 6 F.3d 1233, 1239 (7th Cir. 1993) ("The elimination of formal barriers to expert testimony has merely shifted to the trial judge the responsibility for keeping 'junk science' out of the courtroom. It is a responsibility to be taken seriously."); *Frymire–Brinati v. KPMG Peat Marwick*, 2 F.3d 183, 186–87 (7th Cir.1993) (reversible error where trial court failed to conduct adequate preliminary assessment of expert's methodology). The court has found no authority that suggests this gate-keeping function is inapposite at a bench-trial and, indeed, the requirement that a scientific expert base his or her testimony upon scientific knowledge is equally *apropos* regardless of the identity of the fact-finder.[7]

Plaintiffs have failed to show that Rea and Johnson's theories concerning MCS's causes have been adequately tested; their own evidence suggests just the opposite. As the Seventh Circuit most recently stated, albeit in a different context, "[s]cientific controversies must be settled by the methods of science rather than by the methods of litigation." *Underwager v. Salter*, 22 F.3d 730, 736 (7th Cir.1994). Accordingly, Brown's motion *in limine* is **GRANTED**: the court will not consider Rea's deposition or Johnson's with regard to the causation element of plaintiffs' claim of MCS-related harm.

### b. *Causation.*

The exclusion of expert testimony concerning Roy and Bradley's alleged MCS leads the court to conclude that Roy and Bradley have failed to make out their cases in regards to that ailment. Plaintiffs

---

**7.** By way of contrast, the identity of the fact-finder is relevant where, for example, a court is asked to weigh probity against "unfair prejudice, confusion of the issues, and misleading the jury" under Federal Rule of Evidence 403. *See Gulf*

*State Util. Co. v. Ecodyne Corp.*, 635 F.2d 517, 519–20 (5th Cir.1981) (holding that such a weighing process "has no logical application to bench trials").

have, however, shown a reasonable connection between Brown's negligence and their becoming ill on April 20, 1983. *See Cowe,* 575 N.E.2d at 635 (causation requires reasonable connection between a defendant's conduct and plaintiffs' damages); *Watson,* 532 N.E.2d at 1194 (connection shown by establishing injuries were foreseeable, natural, and probable consequence of defendants' negligence).

Brown's fogging and the air re-circulation system activated on April 20, 1983 resulted in a Pyrtox and kerosene mist pervading the Accounts Payable Building when plaintiffs arrived at work. Drs. Cardiff, Lipsey and Novak testified that the headaches, breathing difficulties, dizziness, and nausea that the plaintiffs experienced were consistent with their exposure to Pyrtox in a kerosene base. The existence of these symptoms in both plaintiffs and the other USX employees exposed to the mist supports the conclusion that all were exposed to Pyrtox and kerosene. A person of Brown's experience applying pesticides should reasonably have foreseen that failure to ventilate the Accounts Payable Building shortly after fogging there would lead to persons being exposed in this way. His failure to assure that the building would, or even could, be ventilated proximately caused plaintiffs' harms.

### 2. *Actual loss or damages.*

The harms that plaintiffs foreseeably would, and in fact did, suffer as a result of Brown's negligence were nausea and severe discomfort. Because their damages arguments were primarily directed to their MCS claims, plaintiffs did not present much evidence on these more modest injuries. At any rate, the court concludes that only minimal damages are appropriate for the discomfort attributable to the April 20, 1983 exposure. To the extent that Roy and Bradley suffered, or suffer, from more serious disorders, the science is simply too nascent to assign a cause to these.

The evidence did show that Roy and Bradley suffered from more discomfort from the exposure than did Welch. Accordingly, the court hereby **ORDERS** that the clerk enter a final judgment in favor of each of the plaintiffs as follows:

For MaryAnn Welch: "Judgment is hereby entered in favor of MaryAnn Welch against Pickens Brown and The Kill Company, jointly and severally, in the amount of $ 500.00."

For Cherrye Bradley: "Judgment is hereby entered in favor of Cherrye Bradley against Pickens Brown and The Kill Company, jointly and severally, in the amount of $ 1000.00."

For Frances Roy: "Judgment is hereby entered in favor of Frances Roy against Pickens Brown and The Kill Company, jointly and severally, in the amount of $ 1000.00."

**SO ORDERED.**