Kathleen **FRANK**, Plaintiff,

v.

**STATE OF NEW YORK,**
et. al., Defendants.

Gretchen **PUSEY**, Plaintiff,

v.

**STATE OF NEW YORK,**
et. al., Defendants.

Mary Elizabeth **BEAUDOIN**, Plaintiff,

v.

**STATE OF NEW YORK,**
et. al., Defendants.

Nos. 95–CV–399 to 95–CV–401.

United States District Court,
N.D. New York.

July 15, 1997.

Maynard, O'Connor, Smith, Catalinotto & D'Agostino,Albany, NY (Brendan F. Baynes, of counsel), for Plaintiffs.

Law Office of Peter Henner, Clarksville, NY (Peter Henner, of counsel), for Defendant Paul Greenberg.

Dennis C. Vacco, Attorney General of the State of New York, Albany, NY (Karen Marcoux Mankes, Asst. Attorney General, of counsel), for Defendant State of New York and Other Defendants.

## MEMORANDUM, DECISION AND ORDER

McAVOY, Chief Judge.

This case presents the question of whether expert testimony concerning "multiple chemical sensitivity" ("MCS") is inadmissible as a matter of law under the Federal Rules of Evidence in an action brought pursuant to the Americans With Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA").

## I. BACKGROUND

Plaintiffs in these consolidated actions are former employees of **defendant New York State Department of Taxation and Finance ("the Department")**. **Plaintiff Kathleen Frank** was employed by the Department as a Supervisor of Data Processing at the time of her November 4, 1993 termination. **Plaintiff Gretchen Pusey** was employed as a Calculations Clerk when she was terminated in November of 1994, and **plaintiff Mary Beaudoin** was an Associate Computer Programmer/Analyst at the time of her April, 1994 termination. Each had been employed by the Department for at least ten years.

Plaintiffs allege that they were exposed to pesticides and other agents in October of 1991 in Building 8 of the New York State Campus in Albany, New York (Beaudoin Compl. ¶ 7; Frank Compl. ¶ 7; Pusey Compl. ¶ 7). Plaintiffs further allege that this initial acute exposure has rendered them hypersensitive to normal, everyday levels of airborne environmental chemicals and pollutants. (Pl. Mem. in Opp. at 1). It is this "disability," to wit, MCS, of which plaintiffs complain. Plaintiffs allege that their condition manifests itself in symptoms such as (but not limited to) fatigue, severe headaches, numbness, respiratory infections, vomiting, insomnia, anxiety and depression. (*Id.*)

Plaintiffs further allege that the State of New York and the Department have violated their rights by failing to make "reasonable accommodations" for their "disabilities." (Pl. Mem. in Opp. at 1). Also named as defendants are seven individual defendants who are employees of the Department. These individuals, in both their official and individual capacities, are alleged to have discriminated against plaintiffs on the basis of their disabilities and failed to provide plaintiffs with reasonable accommodations. Plaintiffs also bring claims under 42 U.S.C. § 1981a, the New York Human Rights Law, Executive Law § 296, the New York Civil Service Law, and New York common law. Plaintiffs seek a declaratory judgment, compensatory and punitive damages, reinstatement or front pay, costs and attorneys' fees.

## II. Discussion

### A. Defendants' Motion

During discovery in these cases, plaintiffs disclosed in their Local Practice Rule 26.3 notices that they planned to call a number of expert witnesses. Defendants now move, *in limine*, to exclude the testimony of such witnesses to the following effect:

1) **Drs. Michael Lax, Eckardt Johanning, Carol Burgess, Mark Schimelman, Stuart Erner:** These experts are medical doctors who will testify that one or all of the plaintiffs suffer from a physical or mental impairment that substantially limits their ability to work, namely MCS. This impairment was caused by exposure to various chemicals. and substances while plaintiffs worked in Building 8. The essence of such testimony will be that plaintiffs suffer unusually severe reactions to low-levels of chemicals and environmental pollutants, causing the symptoms described above. Finally,

these experts will testify that plaintiffs do not suffer these symptoms while at home.

2) **Drs. Orgel and Lovejoy:** These experts, both medical doctors, will testify to the same effect as the above experts in virtually all respects. They do not, however, use the term MCS or make reference to any specific disorder. They do contend that Pusey and Frank suffer from a physical and mental impairment that substantially limits their ability to work, caused and aggravated by exposure to chemicals at Building 8.

3) **Drs. Charles Golden, Joan Gold, Maria Lifrak, Louis Calabro and David Horenstein:** Defendants object to any testimony by these psychologists to the effect that any mental impairment from which plaintiffs suffer was caused by their exposure to chemicals at Building 8. Moreover, defendants object to any of these experts' diagnoses to the extent that they are based upon the MCS hypothesis.

In sum, defendants object to any expert testimony attributing to plaintiffs the "disability" of MCS.

Defendants additionally object to any testimony by these experts that is beyond their field of expertise. For example, defendants object to the proposed testimony of Dr. Jeffrey Perkins, an internist, to the effect that Pusey suffers from a "phobic disorder," where he is not shown to have any expertise in psychology or psychiatry.[1]

### B. Defining MCS

Before venturing further, some discussion of what is encompassed in a diagnosis of MCS is warranted. Simply put, the theory behind MCS is that "various kinds of environmental insults may depress a person's immune system so that the exposed person ... becomes hypersensitive to other chemicals and naturally occurring substances." FEDERAL JUDICIAL CENTER, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 73 (1994). Dr. Lax avers in an affidavit that MCS "is generally defined as an acquired disorder or syndrome in which the patient has recurring multiple symptoms in response to exposure to chemical compounds at levels which are well below levels known to cause harmful effects in the general population." (Lax Aff. ¶ 3). Such chemical compounds are emitted by pesticides, copy machine toners, carpet cleaners, floor cleaners, inks, paints, oils, human nail polishes, perfumes and deodorants. (Mankes Aff. Ex. C ¶ 1(a)).

These somewhat shorthanded definitions comport generally with a definition first proposed in 1987 and later endorsed by the American College of Occupational and Environmental Medicine ("ACOEM") in 1993. E.E. Sikorski, H.M. Kipen, J.C. Selner, C.M. Miller and K.E. Rogers, Roundtable Summary: The Question of Multiple Chemical Sensitivity, 24 FUNDAM. APPL. TOXICOL. 22–28 (1995) [hereinafter *Roundtable Summary*]. That definition includes the following elements: (1) an initial, identifiable environmental exposure resulting in the onset of symptoms; (2) symptoms ranging among multiple organ systems, i.e. nervous and respiratory systems; (3) symptoms recurring and abating in response to exposures to very low levels of diverse chemicals; and (4) symptoms that cannot be accounted for by other medical conditions. *Id.* at 24, Table 1.[2]

It is diagnoses such as these, and expert testimony regarding such diagnoses with which defendants take issue. Although defendants have not had discovery into plain-

---

1. Plaintiffs concede that "their psychological experts should not be permitted to testify that the plaintiffs' physiological impairments are the result of exposure to toxic chemicals." (Pl. Mem. in Opp. at 4). They go on to argue, however, that the psychological experts "should be permitted to testify that the plaintiffs' impairments have a reactive component which, at the very least, have [sic] resulted in a reactive or phobic disorder in response to perceived symptoms arising from the workplace following the acute exposure incident of 10/21/91." (*Id.*).

2. Other organizations and individuals have proposed definitions varying in some degree with that of the ACOEM, but all proposed definitions include the elements of (1) a multi symptomatic disorder; (2) affecting multiple organ systems; (3) resulting from exposure to a diverse array of chemical compounds at levels tolerable by the majority of the population. *See generally* Abba I. Terr, M.D., American College of Physicians, Position Paper: Clinical Ecology, 111 ANNALS OF INTERNAL MEDICINE 168 (July 1989) (citing definitions of Ontario Ministry of Health, M.R. Cullen and journal *Clinical Ecology*).

tiffs' experts, they contend that testimony Lased upon MCS is inadmissible as a matter of law under the governing evidentiary standard.

### C. Standard of Admissibility for Expert Testimony

Under F.R.E. 104(a), "[p]reliminary questions concerning ... the admissibility of evidence shall be determined by the court ...". Defendants argue that the expert testimony at issue is inadmissible under F.R.E. 702, which provides that expert opinion testimony is admissible only when "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue ...". The Supreme Court, in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), recently made explicit the standard district courts must apply in evaluating the admissibility of scientific evidence:

> Faced with a proffer of expert scientific testimony ... the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid ...

*Id.* at 591, 113 S.Ct. at 2796 (footnotes omitted). Requiring that an expert's testimony be based on " 'scientific knowledge' establishes a standard of evidentiary reliability." *Id.* at 590, 113 S.Ct. at 2795.[3]

Courts are to consider the following factors in making this preliminary assessment: (1) whether the scientific theory can be and has been tested; (2) the extent to which the theory has been subject to peer review and publication; (3) the known or potential rate

of error of any scientific technique at issue; and (4) whether the theory is generally accepted within the relevant scientific community. *Id.* at 592–95, 113 S.Ct. at 2796–97.

### 1. Testability/Potential Rate of Error

" 'Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry.' " *Daubert*, 509 U.S. at 593, 113 S.Ct. at 2796 (quoting Green, Expert Witnesses and Sufficiency of Evidence in Toxic Substances Litigation: The Legacy of *Agent Orange* and Bendectin Litigation, 86 Nw. U.L.Rev. 643, 645 (1992)).

Dr. Lax himself concedes that "a test for the existence of MCS does not presently exist and that exposures to certain chemicals cannot recreate MCS symptoms to a scientific certainty[.]" (Lax Aff. ¶ 6). A survey of practices among members of the Association of Occupational and Environmental Clinics ("AOEC") revealed that many of the practitioners surveyed rarely ordered standard allergy tests, brain scans or special blood tests to detect immune system changes in patients reporting MCS symptoms. Kathleen M. Rest, A Survey of AOEC Physician Practices and Attitudes Regarding Multiple Chemical Sensitivity, TOXICOLOGY AND INDUSTRIAL HEALTH, Vol. 8, No. 4, July–August 1992 at 55 [hereinafter *Survey*]. Plaintiffs' own submissions confirm the notion that an MCS diagnosis is virtually untestable. (*See, e.g.*, Pl.Ex. D at 30) (7/22/91 article published by the American Chemical Society noting that physicians "are no closer to finding an objective laboratory test or set of tests to define what, if anything, is physiologically wrong with [MCS sufferers]").

In the view of one commentator, the lack of valid, objective testing procedures for MCS is one of its defining features.[4] "The

---

**3.** Plaintiffs argue that defendants' reliance on cases excluding expert testimony on MCS is misplaced, since none of those cases dealt with ADA claims. This argument is unavailing, since the Court is faced, on this motion, only with the question of whether plaintiffs' MCS experts will be testifying based upon scientific knowledge. *See Sanderson v. Int'l Flavors and Fragrances, Inc.*, 950 F.Supp. 981, 1001 (C.D.Cal.1996).

Whether plaintiffs suffer a "disability" within the meaning of the ADA, or whether MCS constitutes a disability is not in issue.

**4.** Because of the lack of objective evidence to support an MCS diagnosis (or perhaps in spite of it), MCS diagnoses and studies often are based solely upon patient histories or anecdotal evidence, leaving many scientists and clinicians un-

absence of objective physical signs or laboratory indications of pathology and lack of response reproducibility are the hallmarks of the so-called MCS patient." *Roundtable Summary* at 25 (remarks of J.C. Selner). The lack of objective physical signs of abnormality or pathology in MCS sufferers is confirmed by both the American College of Physicians ("ACP") and the American Academy of Allergy and Immunology ("AAAI"). (*See* Aff. of Mark Deninger, M.D. ["Dentinger Aff."] Ex. C) (position paper on clinical ecology by ACP noting that MCS symptoms ostensibly arise "in the absence of objective physical findings, pathologic abnormalities or specific, abnormal result of laboratory tests"); (*id.* Ex. D) (position paper on clinical ecology by AAAI noting that no immunologic data support existence of MCS).

Toxicologist William J. Waddell has concluded that

> The salient problem with MCS is that there is no consistent and specific effect from exposure to any specific chemical. This does not allow for any objective test for any disease entity which might be caused by the chemicals as indicated by the theory of MCS. The effects of exposure to chemicals as defined today as MCS are subjective and no report is available to convincingly demonstrate that these effects would not have occurred merely by chance. It is concluded that (1) MCS, as defined, does not allow specificity or consistency for biological reactions to the effects of chemicals; (2) MCS does not provide a testable hypothesis; (3) MCS is contradictory to the fundamental principles of toxicology; (4) current testing procedures for MCS are so subjective that they are useless; (5) there is no evidence that the responses attributed to MCS are any other than those that would occur merely by chance; and (6) the MCS literature attaches an emotional bias to chemicals.

William J. Waddell, The Science of Toxicology and Its Relevance to MCS, 18 REGULATORY TOXICOL. & PHARMACOL. 13 (1993); *see also* Gregory E. Simon et al., Immunologic, Psychological, and Neuropsychological Factors in Multiple Chemical Sensitivity, 19 ANNALS INT. MED. 97 (July 1993) ("immunologic testing failed to confirm findings from earlier uncontrolled studies, militating against proposed immunologic mechanisms [to explain MCS]").

To the extent that the MCS theory has been tested, such tests have failed to provide objective support for the notion that the symptoms complained of by MCS sufferers are caused by environmental pollutants. In a study presented to the MCS Symposium in Arlington, Virginia in November of 1992, three researchers attempted to develop a clinical algorithm to be used as a diagnostic tool in evaluating MCS patients. *See* Herman Staudenmayer, John Selner and Martin Buhr, Double–Blind Provocation Chamber Challenges in 20 Patients Presenting with "Multiple Chemical Sensitivity," 18 REGULATORY TOXICOL. AND PHARMACOL. 44, 45 (1993) [hereinafter *Provocation Challenges*]. The study essentially consisted of randomly introducing into an air chamber both placebos and actual chemicals that the subject MCS sufferers claimed would give rise to symptoms. Each subject was tested individually, and was asked to indicate whether symptoms arose during the introduction of each agent.[5] *Id.* at 48.

Based upon the responses given by the subjects, the researchers came to the following conclusions: (1) the group was unable to reliably differentiate between active agents and placebos, *id.* at 49; and (2) the group did not demonstrate response patterns consistent with their presenting symptoms of chemical intolerance, nor did they show any signs of toxicity. *Id.* at 50.

Another study by three different researchers headed by Dr. Gunnar Heuser was aimed at linking a diagnosis of MCS with abnormal objective findings on tests of the central or

---

convinced. *See Roundtable Summary* at 23; *Survey* at 55; Dentinger Aff. Ex. D at 270 (position paper on clinical ecology by AAAI).

**5.** The study was double-blind in that neither the individual subjects nor the staff person handling the subject knew whether a given chemical was an active agent or a placebo while it was introduced into the chamber. *Provocation Challenges* at 47.

peripheral nervous system, pulmonary function, chemical antibodies and autoimmune system. G. Heuser, A. Wojdani, and S. Heuser, Diagnostic Markers of Multiple Chemical Sensitivity, MULTIPLE CHEMICAL SENSITIVITIES, ADDENDUM TO BIOLOGICAL MARKERS IN IMMUNOTOXICOLOGY, p. 117–138, National Academy Press, Washington, D.C. (1992) [hereinafter *Diagnostic Markers* ]. According to its authors, the study revealed that certain immune function test results became abnormal when measured after MCS sufferers reported unintentional acute exposure. *Id.* at 117. On its face, the study suffers from at least one flaw which the authors acknowledge: the subjects were not exposed to chemicals in a controlled environmental chamber. *Id.* at 118. Thus, the researchers relied upon the patients' own reports of their work or home environments as well as upon their own reports of the degree and nature of exposure. *Id.* at 118–20. *Cf. Roundtable Summary* at 23 ("Studies done to characterize [MCS] patients and evaluate mechanisms have been criticized for ... not fulfilling accepted investigative norms for the use of control subjects, blinding of patients and investigators, and appropriate use of placebos."); Baynes Aff. Ex. D at 40 (American Chemical Society article noting that "[n]o matter what their beliefs are about the probable cause of MCS, researchers agree that double-blind, placebo-controlled studies should be conducted in an environmental control unit to see whether MCS patients do indeed react to low-level chemical exposures"). The lack of controls and the failure to eliminate other possible variables involved in the Heuser study are apparent.

Moreover, even if the Court were to credit the authors' assertion that the study shows "initial steps" in the direction of finding objective markers for MCS, *id.* at 119, we would be hesitant to conclude that such steps point to a definitive testing method sufficient to render an MCS diagnosis "testable" within the meaning of *Daubert.*

Finally, as defendants point out, the lack of an objective testing method for MCS gives rise to high probability of error in MCS diagnoses. (Def. Mem. in Supp. at 22). Moreover, plaintiffs have submitted no proof of *any* testing rate for MCS, much less a reliable one.

## 2. Peer Review/General Acceptance

"[S]ubmission to the scrutiny of the scientific community is a component of 'good science,' in part because it increases the likelihood that substantive flaws in methodology will be detected." *Daubert,* 509 U.S. at 579, 113 S.Ct. at 2786. Similarly, "widespread acceptance [of a theory] can be an important factor in ruling particular evidence admissible, and 'a known technique that has been able to attract only minimal support within the community may properly be viewed with skepticism.'" *Id.* (quoting *United States v. Downing,* 753 F.2d 1224, 1242 (3d Cir.1985)). Peer review of the MCS theory has revealed a host of flaws in the theory, warranting skepticism as to the validity of MCS. *See generally* Ephraim Kahn & Gideon Letz, Clinical Ecology: Environmental Medicine or Unsubstantiated Theory, 111 ANNALS INT. MED. 104 (July 1989); Ronald E. Gots, Medical Hypothesis and Medical Practice: Autointoxication and Multiple Chemical Sensitivities, REGULATORY TOXICOL. & PHARMACOL. at 2 (August 1993); Donald W. Black, Environmental Illness and Misdiagnosis—A Growing Problem, 18 REGULATORY TOXICOL. & PHARMACOL. 23 (1993).

Moreover, MCS' status in the medical community is a far cry from general acceptance. Reviews of the MCS literature by several established medical organizations (American College of Physicians (1989)), the American Academy of Allergy and Immunology (1986), the California Medical Association (1986), and the American Medical Association have generally found that little scientific evidence exists to substantiate the existence of MCS or establish a cause and effect relationship between MCS and chemicals.

*Roundtable Summary* at 23. In the opinion of the American College of Occupational and Environmental Medicine ("ACOEM"), " '[t]he scientific foundation for managing patients with [MCS] has yet to be established by traditional clinical investigative activities that withstand critical peer review ... the scientific and clinical evidence supporting the pa-

thophysiological mechanisms and treatment regimes as articulated by these practitioners is lacking.'" *Summers v. Missouri Pacific Railroad System,* 897 F.Supp. 533, 535 (E.D.Okl.1995) (quoting 1991 ACOEM statement on MCS). The ACOEM concludes that MCS represents an "experimental methodology." *Id.* at 536.

MCS also has failed to gain acceptance in the field of toxicology. The main resource relied upon by plaintiffs in support of the admission of expert testimony on MCS, a toxicology textbook, hardly expresses a ringing endorsement as to the validity of MCS:

> Many mechanisms have been put forth to explain how chemicals cause these symptoms; however, there remains considerable controversy as to a cause-and-effect relationship. Clinical ecologists, the major proponents of MCS, have focused on immunologic mechanisms to explain the etiology. They hypothesize that MCS occurs when chemical exposure sensitizes certain individuals, and, upon subsequent exposure to exceedingly small amounts of these or unrelated chemicals, the individual exhibits an adverse response. Controlled studies on the immunologic status of individuals with MCS have shown no alterations in their immune system or any indication that MCS results from impairment of the immunity including inappropriate immune response to chemicals.

CASARETT AND DOULL, TOXICOLOGY, THE BASIC SCIENCE OF POISONS 397 (5th ed.1996).[6] The International Society of Regulatory Toxicology and Pharmacology has concluded that "current scientific information reports no clinical, laboratory, or other objective support for the proposition that MCS represents a clinical definable disease entity. The theories claiming to unify this condition as a toxicologically mediated disorder transgress basic principles of toxicology and clinical sciences and moreover the scientific evidence is lacking." 18 REGULATORY, TOXICOL. & PHARMACOL. 79 (1993).

Every federal court that has addressed the issue of the admissibility of expert testimony on MCS under *Daubert* has found such testimony too speculative to meet the requirement of "scientific knowledge." In *Bradley v. Brown,* 852 F.Supp. 690 (N.D.Ind.), *aff'd,* 42 F.3d 434 (7th Cir.1994), the district court determined that "plaintiffs' own evidence clearly establishe[d] that the 'science' of MCS's etiology has not progressed from the plausible, that is, the hypothetical, to knowledge capable of assisting a fact-finder, jury or judge." *Bradley,* 852 F.Supp. at 700. *Summers v. Missouri Pacific Railroad System* adopted the reasoning and conclusions of the district court in *Bradley,* holding that the plaintiffs had "failed to show that the theories concerning MCS's causes have been adequately tested." *Summers,* 897 F.Supp. at 542. The Central District of California followed suit in *Sanderson v. Int'l Flavors and Fragrances, Inc.,* concluding that, "given the present knowledge, *Bradley* and *Summers* correctly determined that MCS does not represent the reliable 'scientific knowledge' which *Daubert* and Fed.R.Evid. 702 require." *Sanderson,* 950 F.Supp. at 1002.

In this district, Magistrate Judge Daniel Scanlon found this line of cases persuasive, and after an examination of the materials submitted by all parties, found that the plaintiffs failed to establish that MCS's etiology was currently known or tested. *Carlin v. RFE Indus., Inc.,* 1995 WL 760739 at *4 (N.D.N.Y.) (Scanlon, M.J.). Moreover, Magistrate Judge Scanlon specifically found inadmissible the expert testimony of Dr. Lax. *Id.* at *7.

This Court is compelled to reach the same conclusion in the present case. The materials submitted by defendants establish that the theory underlying MCS is untested, spec-

---

**6.** Plaintiffs rely on Casarett and Doull primarily for the argument that "human exposure to pesticides and other known toxins causes distress/injury/irritation/inflammation to the central nervous system and the respiratory system and can cause sensory, cognitive, affective and motor disorders." Pl. Mem. in Opp. at 7. Defendants, however, have no quarrel with this proposition as it relates to *acute* exposures to toxins.

(Def.Reply.Aff.¶ 6). Moreover, the chapters in Casarett and Doull submitted by defendants simply discuss the toxic effects of pesticides generally, without discussing hypersensitivity to low-level exposure to toxins. *See generally* Pl. Aff. Exs. G, H, I. Plaintiffs conveniently neglect to submit Casarett and Doull's discussion of MCS. *See supra* at pp. 14–15.

ulative, and far from general acceptance in the medical or toxicological community. Plaintiffs' submissions provide little, if any, support for a contrary conclusion. In short, the testimony on MCS proffered by plaintiffs' experts falls to meet the standard of evidentiary reliability established in *Daubert.* To use words oft-quoted in MCS cases decided under *Daubert,* the controversy surrounding MCS remains to be " 'settled by the methods of science rather than by the methods of litigation.' " *Sanderson,* 950 F.Supp. at 1002 (quoting *Underwager v. Salter,* 22 F.3d 730, 736 (7th Cir.), *cert. denied,* 513 U.S. 943, 115 S.Ct. 351, 130 L.Ed.2d 306 (1994)).

### III. Conclusion

For all of the foregoing reasons, defendants' motion *in limine* is granted. The Court finds that testimony by plaintiffs' medical or psychological experts is inadmissible to the extent that it refers to multiple chemical sensitivity, or to the theory that plaintiffs' alleged symptoms, physiological or psychological, are caused by low-level exposure to environmental pollutants, and that such sensitivity itself was caused by an initial, acute exposure to pesticides at Building 8 in 1991. Defendants do not object to any expert testimony that plaintiffs suffer from psychological or psychiatric impairments, such as anxiety, depression, or phobias, provided that such diagnoses are made by an appropriate expert.

**IT IS SO ORDERED.**