Joanne BAHURA, et al.,
Appellants/Cross-
Appellees,

v.

S.E.W. INVESTORS, et al.,
Appellees/Cross-
Appellants.

Nos. 96–CV–418, 96–CV–490, 96–CV–513, 96–CV–1142 and 96–CV–1143.

District of Columbia Court of Appeals.

Argued Oct. 4, 1999.
Decided June 15, 2000.

Thomas X. Glancy, Jr., Baltimore, MD,
with whom Fredric G. Levin and Mark J.

Proctor were on the brief, for appellants/cross-appellees.

William J. Carter, with whom Gregory A. Krauss and Catherine A. Hanrahan, Washington, DC, were on the brief, for appellees/cross-appellants.

Before STEADMAN, SCHWELB, and REID, Associate Judges.

SCHWELB, Associate Judge.

In 1990 and 1991, a group of twenty plaintiffs, who included employees of the Environmental Protection Agency (EPA) and spouses of EPA employees, brought these consolidated actions against the owners and managers of the buildings housing the EPA's national headquarters. The employee-plaintiffs claimed to have suffered neurological injuries as a result of their inhalation at the workplace of allegedly contaminated indoor air. The spouses' claims were predicated on alleged loss of consortium. In October 1993, the cases of five representative employee-plaintiffs, and of one employee-plaintiff's husband, proceeded to a consolidated jury trial.[1]

At the conclusion of the trial, and in response to interrogatories from the court, the jury found that one of the plaintiffs—Susan Watkins—suffered physical injury as a result of her exposure to contaminants at the Waterside Mall, and that the other four employee-plaintiffs (hereinafter the "somatization plaintiffs") incurred a form of somatization or somatoform disorder.[2] The jury found in favor of Robert Diebold, the husband of an employee-plaintiff, on Mr. Diebold's claim of loss of consortium. The jury awarded damages to all six plaintiffs in the aggregate amount of $948,000.

The defendants filed a post-trial motion for judgment notwithstanding the verdict (JNOV), contending that the evidence was insufficient as a matter of law to establish either that the defendants were negligent or that their conduct proximately caused the plaintiffs' injuries. The trial judge granted the JNOV motion as to the somatization plaintiffs, concluding, *inter alia*, that the emotional harm that these plaintiffs claimed to have suffered was neither serious nor verifiable. *See Sowell v. Hyatt Corp.,* 623 A.2d 1221, 1225 (D.C.1993); *Williams v. Baker,* 572 A.2d 1062, 1068–69 (D.C.1990) (en banc). The judge further granted JNOV against Robert Diebold, denied the JNOV motion as to Ms. Watkins, and entered judgment in Ms. Watkins' favor in the amount awarded to her by the jury.

The somatization plaintiffs, as well as Mr. Diebold, now appeal from the order setting aside the verdicts in their favor. The defendants cross-appeal from the judgment awarding damages to Ms. Watkins. We conclude that the jury awards to the somatization plaintiffs and to Mr. Diebold must be reinstated. In all other respects, we affirm.

## I.

## BACKGROUND

Between 1986 and 1989, the EPA's national headquarters, a leased facility at the Waterside Mall[3] in southwest Washington, D.C. at which more than five thousand persons were employed, underwent major renovations. Contractors replaced carpeting and ceiling tiles, rebuilt and repainted walls, and installed new office dividers.

---

1. The five employee-plaintiffs were Joanne Bahura, Barbara Lively–Diebold, Richard Kirby Biggs, Steven Shapiro, and Susan Watkins. The sixth plaintiff was Robert Diebold, the husband of Barbara Lively–Diebold.

2. A somatoform disorder is one which causes a non-malingering patient to experience real physical symptoms of illness or discomfort for which there is no discernible physical basis.

*See Diagnostic and Statistical Manual of Mental Disorders IV* (DSM–IV) at 445 (4th ed.1994); see also discussion, *infra,* at pp. 936–37.

3. The EPA facility consists of five buildings connected by a large four-story mall. The mall houses offices, retail shops, and restaurants.

Soon after the renovations began, substantial numbers of EPA employees began to report health problems that they attributed to the defective quality of the indoor air at Waterside Mall. Mary Hogrefe, the nurse in charge of the EPA health clinic, testified that over 225 employees came to the clinic complaining of "headache, nasal congestion, hoarseness, ... burning eyes, watering eyes mental confusion, blurred vision, [and] tingling of the fingers." Nurse Hogrefe explained that the Health Clinic operated under standing orders to provide sick individuals with oxygen or to remove them from the building. She stated that some patients were so ill that she found it necessary to escort them out of the building, but noted that with exposure to fresh air "[t]he symptoms would start to disappear, [and] the employee would get much better. Sometimes the symptoms would completely disappear."

In 1988, the agency commissioned a survey which was designed to ascertain the extent of neurological symptoms (sometimes called "sick building syndrome") among employees at Waterside Mall. Over 80% of the employees responded. One half of the respondents reported unusual fatigue, 41% had difficulty concentrating, 61% often or sometimes suffered from headaches, and significant numbers reported other neurological symptoms. The evidence of serious environmental difficulties at the EPA's own headquarters was widely publicized and came to the attention of Congress. The agency opened a special health clinic to handle indoor air quality complaints. The EPA also established an alternate work space policy to accommodate employees who had apparently become ill as a result of their exposure to contaminated air. In addition, teams of outside neurologists, toxicologists, engineers, and safety inspectors were retained as consultants in the hope that they could help the EPA to combat the chemical

exposure problems that had arisen throughout the complex.[4]

The representative plaintiffs whose cases went to trial included five EPA employees who claimed to have been injured as a result of the conditions at the Waterside Mall, as well as the husband of one of the employee-plaintiffs. See note 1, *supra.* They alleged in their complaint that the defendants had failed to provide adequate ventilation at the EPA headquarters and that the buildings had been negligently maintained and renovated. The plaintiffs claimed that they had been exposed to toxic chemicals during renovation, and that their exposure to the contaminated air caused them to suffer serious neurological illness, including brain damage. The defendants denied negligence and contested the plaintiffs' claims of injury and causation. After a mini-trial designed to facilitate a settlement failed to achieve its goal, the parties and the court agreed that the initial jury trial should take up the claims of the six plaintiffs whose cases are now before us.

## II.

### THE TRIAL

The trial of this case lasted seven weeks, and the record before us is extensive. We confine our discussion of the evidence to those facts that require exposition in order to dispose of the issues raised on appeal.

A. *The plaintiffs' evidence.*

The case for the plaintiffs consisted primarily of expert testimony designed to show that the defendants violated the applicable standard of care and that these violations proximately caused the employee-plaintiffs' injuries. The plaintiffs, their medical experts, and additional fact witnesses described the injuries that the

---

**4.** One consulting neurologist treated between fifty and sixty employees who complained of neurological symptoms. A consulting industrial hygienist testified that in his survey of

over one hundred EPA employees, many became ill inside the EPA facility but felt better after leaving the building for a significant period of time.

plaintiffs claimed to have suffered as a result of the defendants' negligence.

The plaintiffs' expert witnesses testified that Waterside Mall lacked sufficient ventilation to conform to minimum industry standards. They explained that when a building lacks adequate air flow, contaminants may build up and, quite literally, poison those who live or work within the contaminated space. If credited, the testimony of the plaintiffs' experts established that this is what happened at Waterside Mall. When renovations began, the inadequate ventilation trapped dangerous organic compounds inside the building. According to Professor James Woods,[5] the concentration of contaminants in the indoor air rose to dangerously high levels during normal operations. Professor Woods stated that "for a building of its size, which is over a million square feet, [the Waterside complex presented] the worst ventilation problems" he had ever seen.

The plaintiffs' experts also testified that, in their view, the defendants' supervision of renovations at the EPA headquarters did not satisfy the applicable standard of care. There was evidence that the renovations were conducted near the plaintiffs' work areas, and according to the plaintiffs' experts, the defendants failed to screen off and separate employee work space from the ongoing construction. Consequently, fumes and toxins released into the air during renovation quickly moved to the areas in which the plaintiffs and other employees were performing their jobs. In the opinion of the plaintiffs' experts, the defendants failed to follow basic safety standards for handling chemicals and vapors associated with carpeting, new walls, paint, glue, and other construction materials. Professor Woods testified that this failure on the part of the defendants exposed each of the plaintiffs to "two, three, four times the level associated with neurotoxic injury in the scientific literature," or, to put it in more concrete terms, to levels harmful "enough to cause people to get sick."

All of the employee-plaintiffs claimed that their exposure to contaminants at the Waterside Mall caused them to experience serious and persistent health problems for substantial periods of time.[6] Each plaintiff reported extensive difficulties in concentrating, loss of memory, impairment of general cognitive functioning, extreme fatigue, and a variety of other symptoms. Joanne Bahura, for example, suffered loss of memory and concentration, diminished hand-eye coordination, weight loss, and sporadic difficulties with moving the left side of her body. Ms. Bahura became depressed and even paranoid, suffered from headaches, and allegedly became nauseous when exposed to certain solvents and compounds. On a visit to the perfume section of a department store, she became pale, dizzy, and weak, she found it difficult to breathe, and she was unable to keep her balance, almost falling down. Ms. Bahura also developed bad headaches, and, according to her husband's testimony, it took her a long time to recover. All of the other somatization plaintiffs reported similar difficulties and experiences on a long-term basis. Steven Shapiro also testified that he was sick "much of the time"; Richard Biggs' health changed "dramatically" and he felt sick "all the time"; and Barbara Diebold was in a "lot of pain," depressed, and irritable to the extent that she spent approximately six months mostly in bed and was unable to work for a year and a half.

Susan Watkins was the sole employee-plaintiff to whom the jury awarded damages for physical (as distinguished from

---

5. The principal expert witnesses who addressed the defendants' alleged violations of the applicable standard of care were Professor Woods of Virginia Polytechnic Institute, a specialist and instructor in building technology, and Irwin Fischer, an industrial hygienist.

6. Professor Woods testified that each of the plaintiffs was working in an area under renovation during the relevant time frame.

psychogenic) injury. On three different occasions between August 1988 and March 1990, Ms. Watkins became ill at work and had to be taken to the emergency room. During the second episode she passed out altogether. Ms. Watkins described the final incident:

> In March of 1990, there were—I came to work again in the morning, and there had been renovations in the ceiling. They were doing something with the ceiling tile. There was debris and dust in my office.
>
> I came into work and I started having trouble breathing, and I felt really weak and sick. And, again, the health unit called the emergency—the rescue squad came.

One of Ms. Watkins' co-workers, Vanessa Musgrave, provided dramatic testimony regarding the severity of Ms. Watkins' symptoms:

> One morning very early, Susan and I were in the office. Because both of us were on an early schedule, and she had an office next to mine. We were speaking to one another, when suddenly—they were cutting Gypsum board at the time, and suddenly this dust arose and I started to cough violently and Susan started to have difficulty breathing and I was so frightened because she couldn't breathe. So I ran to the Health Unit and pounded on the door, and luckily it was before the nurses' hours, but she was there, and she came running down and got Susan with a wheel chair and took her back to the nurse's office.
>
> And at that point Susan didn't know who she was and was barely breathing. I really thought she was going to die. I was afraid the nurse wouldn't get there in time. I was scared out of my mind.

The plaintiffs also presented the testimony of medical expert witnesses. According to these experts, the plaintiffs suffered neurological symptoms and injuries as a result of their exposure to contaminants at the workplace. Specifically, the plaintiffs' experts testified that the employee-plaintiffs were suffering from "toxic encephalopathy," a condition which "occurs when there has been an alteration to the brain and central nervous system function due to exposure to various toxins." *Berry v. CSX Transp., Inc.*, 709 So.2d 552, 554 n. 2 (Fla.Dist.Ct.App.), *review denied*, 718 So.2d 167 (Fla.1998). No evidence was adduced by the employee-plaintiffs to suggest that they were suffering from a somatization disorder.

### B. The case for the defendants.

The expert witnesses called by the defense challenged the very underpinnings of the plaintiffs' case. According to defense experts who examined the plaintiffs, the plaintiffs did not suffer any physical injury at all. The position taken by most (but not all) of the defense witnesses was that the plaintiffs' symptoms resulted from pre-existing mental or emotional problems unrelated to the conditions at the EPA headquarters.[7] Different defense experts attributed the plaintiffs' symptoms to "conversion disorder," "conversion reaction," "depression," or even "hysteria." David Smith, an EPA "risk management consultant" who was not a health care professional, testified over objection by counsel for the plaintiffs that some employees who had reacted to what they "believed had been a toxic release ... reflected the characteristics of mass psychogenic illness."

Two defense experts, Dr. Abba I. Terr and Dr. Philip Witorsch, testified that, in their opinion, the plaintiffs were suffering from a "somatization disorder." Both witnesses were careful to explain that a somatoform illness reflects real symptoms, and that it is not to be confused with the

---

**7.** There were exceptions among the expert witnesses who testified for the defendants.

See *infra* pp. 939–40.

feigned or imaginary ailment of a malingerer. See *infra* pp. 936–37.

### C. *The emergence and disposition of the issues relating to somatization.*

The questions relating to the compensability and causation of somatoform disorder apparently escaped the notice of the participants in the trial while the evidence was being presented, and first became a subject of dispute at a very late stage of the proceedings. A brief discussion of the emergence of these issues may be helpful.

In his opening statement, and in the presentation of expert testimony, counsel for the plaintiffs relied on a single theory of the case, namely, that the employee-plaintiffs had suffered physical neurological injury as a result of their exposure to contaminants at the work place. Counsel did not claim, in the alternative, that the defendants' conduct had inflicted a somatization injury. Subsequently, at least one of the plaintiffs' experts ruled out somatization as an explanation of the employee-plaintiffs' symptoms.

The plaintiffs having made no claim that they had suffered a somatoform disorder, or that they were entitled to recover damages for that condition, the defendants did not address the merits of such a claim. In renewing his motion for a directed verdict after all parties had rested,[8] counsel for the defendants made no reference to the compensability of somatization or to the question whether a sufficient causal nexus existed between the alleged negligence and the somatization plaintiffs' injuries. It appears that, even after the defense experts had introduced the subject of somatization into the record, no party focused upon the proper resolution of the case in the event that the jurors found that the defendants were negligent but credited the defense testimony that the plaintiffs had incurred a somatization disorder, but not a physical injury, as a result of the defendants' negligence.

■ During his closing argument, plaintiffs' counsel told the jury that his clients were entitled to recover damages even if they had sustained a somatization disorder rather than physical injury, so long as "the renovations played a substantial part in bringing about the symptoms." This was evidently the first time that any participant in the trial raised the issue. It does not appear that counsel asked the court for leave to make this argument, or for an instruction specifically addressing it.[9] Nevertheless, defense counsel did not object. Again without objection, the judge instructed the jurors that if they found in favor of the employee-plaintiffs, they should consider, *inter alia*, the effects of each plaintiff's injuries on his or her "mental health and well-being," as well as "any mental anguish the plaintiff suffered ... and will probably suffer in the future." By its terms, this instruction could be applicable only if the jury decided that the plaintiffs had suffered compensable harm. There was no instruction requested or given regarding whether a plaintiff could recover for a somatization injury.

The wisdom of jurors ought not to be underestimated. Two days into deliberations, the jury sent the following note to the judge:

> If the Plaintiffs are not physically injured, but they believed they were (somatization) is that considered injury?

Predictably, counsel for the plaintiffs argued that the question should be answered "yes," while counsel for the defendants urged the judge to respond with a simple "no."

8. Counsel had first asked the judge to direct a verdict in favor of the defendants at the close of the plaintiffs' case. At that time, no somatization evidence had been introduced. The judge denied the motion.

9. Judges, not attorneys, decide questions of law, and counsel should not attempt to argue, or be permitted to argue, disputed legal propositions to the jury without prior leave of court. *Cf. Salmon v. United States*, 719 A.2d 949, 951 n. 3 (D.C.1997).

This key issue having arisen in the midst of jury deliberations, and without the benefit of briefing by counsel, the trial judge quite reasonably punted. Rather than responding to the jury's inquiry, the judge propounded a series of interrogatories to the jury with respect to each employee-plaintiff:

1. Was Plaintiff physically injured?

2. Did Plaintiff believe she was injured (somatization)?

The judge further instructed the jurors to complete the original verdict form, which required the jury to specify the amount of damages awarded to any plaintiff who prevailed on the question of liability, if either question was answered in the affirmative.

After three more days of deliberation, the jury returned a verdict in favor of each of the plaintiffs. The jury found that Susan Watkins suffered physical injury, that the four other employee-plaintiffs "believed [they were] injured (somatization)," and that Robert Diebold incurred loss of consortium. The jury awarded the following damages:

| | |
|---|---|
| Susan Watkins | $232,000 |
| Joanne Bahura | $229,000 |
| Barbara Lively–Diebold | $194,000 |
| Richard Biggs | $136,000 |
| Steven Shapiro | $129,000 |
| Robert Diebold | $ 28,000 |

After the jury was discharged, the defendants moved for JNOV, arguing that the plaintiffs had failed to prove either negligence or causation and that somatization disorder was not generally accepted in the medical community as an illness or injury and therefore was not compensable. The defendants did not ask for a new trial in the event that their request for JNOV was denied. The plaintiffs filed a post-trial motion for a new trial as to damages only, claiming that certain allegedly erroneous evidentiary rulings by the trial judge had prejudiced them in attempting to prove long-term neurological injury. See note 15, *infra*.

On November 24, 1995, the trial judge issued a twenty-page written order in which he granted the defendants' motion in part. The judge concluded that the somatization plaintiffs' injuries were not "serious or verifiable" and that "somatization is not a compensable injury in these circumstances." Although the judge stated that he therefore need not reach the defendants' contention that the somatization plaintiffs' claims must fail for failure of proof of proximate cause, he nevertheless went on to decide that issue in the defendants' favor as well:

> [The plaintiffs] offered no expert testimony connecting somatization with the acts of the Defendants, nor can they find support in Defendants' expert testimony. Drs. Bradley and Callendar testified that Plaintiffs suffered physical, not psychological injuries. Defense experts Drs. Witorsch, Gordon, Moses, and Terr testified that Plaintiffs' somatization disorder was not caused by the negligent acts of Defendants. Dr. Schwartz, a toxicologist, testified renovations could not generate enough solvent fumes to cause the kind of injuries claimed here. Plaintiffs' witness Dr. Bell even testified that psychological causes could be ruled out. The link between physical injury and non-physical source is not self-evident in this case, and without expert testimony, the evidence does not support a conclusion that Defendants' negligence caused a psychogenic or somatization injury.

The judge sustained the verdict in favor of Ms. Watkins, and he denied the plaintiffs' motion for a new trial on damages. The parties filed timely appeals.

### III.

### THE PLAINTIFFS' APPEAL

A. *The standard of review.*

The question whether the trial judge erred by setting aside the jury's findings is one of law, and we review *de novo* the judge's award to the defendants of JNOV as to the claims of the somatization plaintiffs and of Mr. Diebold. *See,*

*e.g., District of Columbia v. Wilson,* 721 A.2d 591, 596 (D.C.1998). "A judgment notwithstanding the verdict is proper only in 'extreme' cases, in which no reasonable person, viewing the evidence in the light most favorable to the prevailing party, could reach a verdict for that party." *Id.* (quoting *District of Columbia v. Cooper,* 445 A.2d 652, 655 (D.C.1982)) (en banc). We recently had occasion to elaborate on these principles in another professional negligence case in which, as in these appeals, the principal issue related to the sufficiency of the plaintiff's proof of causation:

> "If there is room for a difference of opinion, the wise course is for the trial judge to allow the case to go to the jury." *Corley v. BP Oil Corp.,* 402 A.2d 1258, 1263 (D.C.1979) (citation omitted). "Motions for a directed verdict deprive plaintiff of a determination of the facts by a jury and should, therefore, be granted sparingly." *Id.* (citation omitted). It is only in "unusual" cases that issues of negligence and proximate cause may be taken away from the jury. *Rich v. District of Columbia,* 410 A.2d 528, 532 (D.C.1979) (citations omitted).

*Robinson v. Group Health Ass'n,* 691 A.2d 1147, 1150 (D.C.1997).

B. *Serious and verifiable injury.*

The defendants contend, and the trial judge held as a matter of law, that the injuries sustained by the somatization plaintiffs were not sufficiently "serious" or "verifiable" to entitle these plaintiffs to any recovery. We disagree.

As we have previously noted, the employee-plaintiffs did not claim during the presentation of the evidence that they had the right to an award of damages even if they could not show that they had suffered a physical neurological injury. After the plaintiffs' counsel belatedly introduced this contention into the case during his argument to the jury, the compensability of negligently inflicted somatoform disorder emerged as a central issue in the case.

The trial judge analyzed somatization as a psychogenic injury, and the somatization plaintiffs' case became, in effect, an action for the negligent infliction of emotional distress. In light of this development, the principal question presented by the plaintiffs' appeal is whether the evidence, viewed in the light most favorable to the plaintiffs, would permit an impartial juror to find in the plaintiffs' favor in a negligent infliction action. Because the parties did not recognize until late in the proceedings that the case would implicate the tort of negligent infliction of emotional distress, the evidence was not organized or presented with the elements of that kind of claim in mind. Nevertheless, we conclude that the evidence, viewed in the light most favorable to the plaintiffs, was sufficient to permit an impartial jury to find in the somatization plaintiffs' favor.

■ Ten years ago, the en banc court held in *Williams v. Baker, supra,* 572 A.2d at 1067, that "if the plaintiff was in the zone of physical danger and was caused by defendant's negligence to fear for his or her own safety, the plaintiff may recover for negligent infliction of serious emotional distress...." In a negligent infliction case, there can be recovery for mental and emotional distress only if the plaintiff's injuries are "serious and verifiable." *See Sowell, supra,* 623 A.2d at 1225; *Jones v. Howard Univ.,* 589 A.2d 419, 421 (D.C. 1991). The trial judge was of the opinion that the somatization plaintiffs' injuries were neither serious nor verifiable.

■ This court has previously sought to identify the kind of psychogenic injury which is sufficient to sustain a complaint for negligent infliction of emotional distress:

> The fact that the different forms of emotional disturbance are accompanied by transitory, non-recurring physical phenomena, harmless in themselves, such as dizziness, vomiting, and the like, does not make the actor liable where such phenomena are in themselves inconse-

quential and do not amount to any substantial bodily harm. On the other hand, long-continued nausea or headaches may amount to physical illness, which is bodily harm; and even long continued mental disturbance, as for example in the case of repeated hysterical attacks, or mental aberration, may be classified by the courts as illness, notwithstanding their mental character. This becomes a medical or psychiatric problem, rather than one of law.

*Williams, supra,* 572 A.2d at 1068 (quoting Restatement (Second) of Torts § 436A cmt. c). In the present case, the symptoms reported by the somatization plaintiffs were not transitory, non-recurring, or inconsequential. On the contrary, these plaintiffs complained of debilitating fatigue, loss of motor control, persistent cognitive problems, extreme depression sometimes approaching paranoia, flu-like pains, shortness of breath, and a variety of other symptoms. According to the somatization plaintiffs and their witnesses, these conditions sometimes lasted for months at a time and, in some cases, periodically recurred for years. To be sure, there was significant testimony which, if credited, would have sustained a finding that the harm suffered by the somatization plaintiffs was not sufficiently serious to support recovery. We are satisfied, however, that the issue of seriousness was not so one-sided in favor of the defendants that no question for the jury was presented.

There was also ample evidence that the somatization plaintiffs' injuries were verifiable. The defense effectively conceded that the plaintiffs were not feigning their symptoms or fabricating their complaints. On the contrary, Dr. Abba Terr, a specialist in internal medicine and allergy immunology who appeared as an expert witness for the defense, testified as follows:

> Their symptoms are absolutely real. I want to make that clear. What they are experiencing is, I don't believe they make it up. I think they are relating exactly how they feel, and they do suffer

from it, the concept that it was caused by chemicals is the belief, not the reality of their symptoms.

A second defense expert, Dr. Philip Witorsch, a specialist in pulmonary diseases whose area of concentration is environmental and occupational medicine, testified as follows:

> Somatoform or somatization in general refers to a circumstance where people are having real symptoms. They're not imagining the symptoms. They clearly have symptoms and discomfort in many cases, and they're experiencing physical symptoms. However, the physical symptoms are not on the basis of any physical injury, but rather the result of emotions.

In addition, the somatization plaintiffs' experiences were described for the jury not only by the plaintiffs themselves, but also by their physicians, and by spouses and other fact witnesses. The similarity of some of the symptoms suffered by all four of the somatization plaintiffs rendered their experiences, in some measure, mutually corroborative. Each plaintiff's account tended to verify the complaints of his or her fellow-plaintiffs. Finally, the somatization plaintiffs' symptoms substantially corresponded to the complaints reported by many hundreds of EPA employees in the 1988 survey, to the testimony of Nurse Hogrefe, and to the reports of EPA consultants. See note 4, *supra.*

Somatoform disorder is a recognized medical condition, see *DSM–IV* at 445, and it has served as the basis for an award of damages. In *Wasiak v. Omaha Pub. Power Dist.,* 253 Neb. 46, 568 N.W.2d 229, 232–33 (1997), a case involving injuries suffered by Charles Wasiak in an automobile accident, the plaintiff reported symptoms similar to those related by some of the somatization plaintiffs here. In *Wasiak,* as in the present case, the plaintiff's experts testified that the plaintiff had suffered physical injury. The defense experts, on the other hand, asserted that Wasiak's symptoms were attributable to somatiza-

tion. The trial judge agreed with the defense that the accident had caused no physical injury, but he nevertheless held that Wasiak was entitled to recover damages for his somatization disorder. The defendants appealed, claiming, *inter alia*, that Wasiak had failed to prove causation. The Supreme Court of Nebraska affirmed the judgment, relying on the trial judge's finding that "Wasiak's somatization was another manifestation of injury resulting from the 1991 accident." *Id.* at 233 (italics omitted).[10]

In the present case, an impartial jury could reasonably find that the psychogenic injuries suffered by the somatization plaintiffs were serious and verifiable, and that a somatoform disorder is compensable. We conclude that the trial judge erred in holding to the contrary.

## C. *Causation.*

In their motion in the trial court for judgment notwithstanding the verdict, the defendants also contended that the somatization plaintiffs' psychogenic injuries were not proximately caused by conditions at the Waterside Mall. According to the defendants, no impartial jury could reasonably find that the plaintiffs had satisfied their burden of establishing causation. Although, in a technical sense, the trial judge did not reach this issue, he expressed his agreement with the defendants' position. See p. 935, *supra.* Viewing the record in the light most favorable to the plaintiffs, we are constrained to conclude that proximate cause was established and that the jury's verdict should therefore have been sustained.

### (1) *"Rising above" one's own evidence.*

█ Correctly noting that none of the somatization plaintiffs' experts testified that these plaintiffs suffered a psychogenic

injury or that any such injury was caused by the defendants' negligence, the defendants argue that "[t]he [p]laintiffs should not be allowed to rise above their own evidence." This contention is fallacious. The sufficiency of the evidence of causation must be determined on the basis of the entire record, and it will not do to examine only the testimony introduced by the plaintiffs.

█ In *Greet v. Otis Elevator Co.*, 187 A.2d 896, 897 n. 1 (D.C.1963), this court stated the applicable principle:

> If a plaintiff has made out a prima facie case, a motion for a directed verdict at the close of plaintiff's evidence should be denied without restriction. The theory or theories upon which the case is submitted to the jury should be determined at the close of all the evidence because some evidence elicited from defendant's witnesses may be advantageous to plaintiff.

*Accord, Harris v. Plummer*, 190 A.2d 98, 99 (D.C.1963) (quoting *Greet* ); *see also J. Maury Dove Co. v. Cook*, 59 App.D.C. 61, 62, 32 F.2d 957, 958 (1929). The former Supreme Court of Errors of Connecticut has correctly explained that

> [t]he jury were not confined to the evidence offered by the plaintiff or any one witness. The truth in closely contested cases does not always lie altogether upon one side. It is often found partly in the evidence of a plaintiff and partly in that of a defendant.

*Giambartolomei v. Rocky DeCarlo & Sons, Inc.*, 143 Conn. 468, 123 A.2d 760, 763 (1956).

In the present case, the trial judge instructed the jury, in conformity with District of Columbia Standardized Civil Jury Instruction No. 2.9 (1998), as follows:

**10.** We note, however, that the *Wasiak* case differs from the present one in several respects. For example, the Supreme Court of Nebraska held that, notwithstanding the trial judge's findings, "the record [was] replete with evidence that Wasiak suffered other significant injuries caused by the accident which are sufficient to support the trial court's judgment and award." 568 N.W.2d at 233.

In deciding whether a question has been proved by a preponderance of the evidence, you should consider all of the evidence bearing on that question regardless of which party produced it. Each party is entitled to the benefit of any evidence which favors [it]. . . .

The judge also told the jurors that they were free to disregard any expert opinion "in whole *or in part.*" (Emphasis added.) There was no objection to either of these instructions, and we conclude that they were legally sound.

### (2) *The defendants' view of the evidence.*

■ The defendants next contend that even if the plaintiffs are permitted to "rise above" their own evidence, the record will not support a jury finding of proximate cause. They argue, essentially, that the requisite proof of causation could not have been provided by the plaintiffs' expert witnesses, because these witnesses did not believe that any of the plaintiffs suffered from somatoform disorder. If the plaintiffs' experts discerned no psychogenic injury, then, according to the defendants, these experts could not have testified that the defendants inflicted that kind of an injury on the somatization plaintiffs. The defendants essentially view the case as comparable to a hypothetical one in which an expert for the plaintiff claimed that the defendant's negligence caused the plaintiff to suffer a heart attack, but in which the jury found that the plaintiff's heart was healthy but that the plaintiff had sustained a broken leg. According to the defendants, the somatization plaintiffs' claimed injuries are so unlike the psychogenic disorder found by the jury that the testimony of the plaintiffs' experts regarding causation is just as beside the point here as it would be in the hypothetical situation that we have postulated.

The defendants also assert that a finding of causation cannot be predicated on the testimony of the expert witnesses for the defense because, according to the defendants, these experts rejected the existence of any link between the somatization plaintiffs' disorder and the conditions at the Waterside Mall. The defendants conclude that because neither the experts for the plaintiffs nor the experts for the defendants provided evidence establishing proximate cause, the trial judge did not err in granting JNOV.

Although there is a certain appealing symmetry in the defendants' position, we do not believe that their argument can carry the day. In our judgment, the defendants take an unduly cramped view of the expert testimony, and they fail to rebut reasonable inferences that a fair-minded juror could legitimately draw from the sequence of events reflected in this record.

### (3) *The relevant expert testimony.*

We do not agree with the defendants' assertion that there is no expert testimony linking the somatization plaintiffs' symptoms and injuries to the defendants' negligence. The belated emergence of the issue concededly makes the record less specific on the point than it might otherwise have been. Even so, there is significant expert evidence supporting a finding of causation.

Dr. Iris Bell, a psychiatrist and psychopharmacologist, was called by the plaintiffs as an expert witness. Dr. Bell testified that the plaintiffs suffered "neurological" symptoms as a result of their exposure to contaminants during the renovations of the Waterside Mall. It is noteworthy that the term "neurological" was also used by two defense experts who went on to testify that the plaintiffs were suffering from a somatoform disorder. As the plaintiffs logically argue in their brief, "[t]he jury need not have been persuaded by Dr. Bell's opinion that the [p]laintiffs' symptoms were manifestations of a chemical insult to their brains to accept her opinion that those symptoms, which were not present before renovations, were caused by renovations."

The testimony of several of the defense experts, including Dr. Sorell

Schwartz, Dr. Abba Terr, and Dr. Phillip Witorsch, though generally favorable to the defendants, nevertheless recognized the existence of a causal link between the plaintiffs' somatization disorder and the conditions at the Waterside Mall. These witnesses testified, in essence, that the plaintiffs' symptoms were the product of odorant conditioning, a process by which an unpleasant reaction to noxious chemicals or odors causes a person to associate similar odors with that adverse physical reaction. As a consequence, such an individual may subsequently experience the same physical reaction if he or she is exposed to otherwise harmless substances and odors associated with the earlier exposure. According to these defense experts, the plaintiffs' exposure to contaminants at the EPA headquarters was capable of causing acute physical discomfort and of generating the plaintiffs' subsequent adverse reactions to substances and odors which otherwise would not have adversely affected the plaintiffs. Indeed, according to Dr. Schwartz, it was a "likely explanation that the conditions during renovation triggered the odorant conditioning process which produced the plaintiffs' symptoms." Dr. Schwartz explained:

[W]ith certain of these organic solvents, there—there is what we call—a prodromal or earlier effect, at a lower—at lower levels. The effect may be headache. It may be nausea. It may be eye irritation. It may be throat irritation. This—it causes—it's annoying and it causes discomfort. [Whether] [t]hese are ... toxic effects is somewhat of a semantic question. They are reversible effects, but still individuals identify certain odors with certain conditions.

And, it's not unlike hearing music that you heard as a teenager, with your fa- vorite girlfriend, and it reminds [you] of things. There are—there are types of responses, and the same thing occurs with odors. In fact, *there is something called behavior [odorant] conditioning, which is now recognized, where individuals have had negative experiences due to various types of exposures, and just detecting the odor will make them—they will feel bad. . . . So, it's a—it's—that's what we call odor and [sic] conditioning* behavior, [odorant] conditioning. And, if you've had a bad experience with it, if you have had a food and you ate that food, and even one that you liked, and became nauseated afterwards, for whatever reasons, you might have gotten sick for some other reason, then the odor of that food later on, may actually ... make you nauseated.

(Emphasis added.) [11]

Dr. Schwartz further testified that exposure to organic solvents during the renovation of the Waterside Mall may have caused the plaintiffs temporary acute discomfort, and that this discomfort may have set off the odorant conditioning process. He stated that "the odors and irritation might be annoying, cause some headache, nausea, and such like that" and that "if you're referring to the fact that they find chemicals to cause them to be, odors of chemicals to cause them to be disporic or have a sense of poor being, I would say that the time of renovation apparently had an impact." Dr. Schwartz gave testimony particularly relevant to the issue of causation when he was asked by defense counsel about symptoms reported by one of the somatization plaintiffs, Samuel Shapiro:

I mean, if, in fact, he at one time, was very annoyed, had a headache and working in the environment was very unpleasant for him and he identified that

---

11. Dr. Terr, an internist and immunologist, described the plaintiffs' somatization disorders in similar terms:

There is a coincidence of having these symptoms, and they have it before, with a certain event, in this case, exposure to chemicals. Once that happens, once you make that connection in your mind, then every time you're exposed to something you conceive—you perceive to be a chemical, there's a likelihood that you're going to get sick from it. It's a pattern of illness.

with these odors, that he detected during renovation, then it's not inconceivable that smelling the same odors in other things, such as nail polish, magic markers, Wite-out, and so forth will trigger—will trigger the same response. It's just a common thing to occur.

On cross-examination, Dr. Schwartz elaborated:

Q: Now, you talk about odors. Are you telling this jury that a bad experience in this building during renovations has set off some reaction where these people just react to odors? Is that what you're saying?

A: No. I didn't say that at all. I said that *that is a likely explanation.*

(Emphasis added.)

Finally, Dr. Karen Bolla, a chemical neuropsychologist who had treated Joanne Bahura, was called as a witness for the defendants. In May 1988, Dr. Bolla wrote in her evaluation that Ms. Bahura's depression "appears to be the result of her occupational disorder." At trial, Dr. Bolla testified that Ms. Bahura's symptoms were not the result of toxic exposure at the workplace. On cross-examination, however, Dr. Bolla acknowledged that Ms. Bahura did not suffer from depression before she went to work at Waterside Mall. Dr. Bolla elaborated as follows:

I think her depression was a direct result of her belief and her probably feeling ill in her environment, that some of these chemicals were irritants and hurting her eyes and her throat. So yeah, I think it was a direct result of walking into a situation where she didn't like being because of the environment.

We conclude that the expert testimony that we have cited, viewed in the light most favorable to the plaintiffs, cumulatively afforded "a reasonable basis for the conclusion that it was more likely than not that the conduct of the defendant[s] was a cause in fact of the plaintiff[s]' injuries." *Robinson, supra,* 691 A.2d at 1150 (internal quotation marks omitted).

### (4) *The sequence of events.*

█ Moreover, the expert testimony that we have summarized above should not be appraised in a vacuum, for it is by no means the only evidence of causation presented in this record. As several of the experts recognized, the symptoms reported by the somatization plaintiffs were genuine. These plaintiffs became ill shortly after they were exposed to the conditions at the Waterside Mall. In addressing challenges to the sufficiency of a plaintiff's evidence of causation, courts properly take into consideration the order in which significant events have occurred. Indeed, if the sequence of events is sufficiently compelling, then it alone, without more, may provide the requisite nexus between the defendant's negligence and the plaintiff's injury.

█ We have held that in some circumstances the "close proximity in time" between an accident and a plaintiff's "subjective symptoms of physical injury" may render unnecessary the presentation of expert testimony as to causation. *See Jones v. Miller,* 290 A.2d 587, 591 (D.C.1972). In such cases, "[t]he causal connection between the accident and the injury may be satisfied by the close proximity in time between the accident and the symptoms...." *Otis Elevator Co. v. Tuerr,* 616 A.2d 1254, 1260 (D.C.1992).[12] We recently emphasized the importance of timing (and sustained the trial judge's finding of causation) in a case which differs from the present one in terms of the facts before the court, but which resembles our scenario with respect to the applicable principle:

---

**12.** Relying on *Jones* and *Otis Elevator,* the plaintiffs plausibly argue that in this case, the demonstrated sequence of events alone was sufficient to show proximate cause, and that this court need not consider the expert testimony on that issue. Because expert testimony in the record also supports that finding, we need not, and do not, decide whether the proof of temporal proximity alone would have been sufficient.

Ms. Okyiri spilled the beans to the OIG auditors, and shortly thereafter she was cashiered. "Coincidences happen, but an alternative explanation not predicated on happenstance is often the one that has the ring of truth." *Tursio v. United States*, 634 A.2d 1205, 1213 (D.C.1993) (quoting *Poulnot v. District of Columbia*, 608 A.2d 134, 139 (D.C.1992)).

*Raphael v. Okyiri*, 740 A.2d 935, 955 (D.C. 1999).

 To be sure, a trier of fact may be well advised to exercise a measure of caution when assessing a contention that an antecedent event necessarily caused a later one. "[C]ontiguity of space or nearness of time do not, by themselves, afford a proper test for determining whether the negligence charged was the proximate cause of the injury." 65 C.J.S. *Negligence* § 107, at 1152 (1966 & Supp.1999) (footnote omitted). Rain on the day the war ends does not prove that peace will not brook sunshine. In other words, if something happens after an occurrence (*post hoc*), it has not necessarily happened on account of that occurrence (*propter hoc*); hence the *post hoc ergo propter hoc* fallacy. But neither obeisance to Latin phrases nor our more general obligation to exercise caution before converting "after" into "because" requires us to be blind to common-sense inferences from the timing of the somatization plaintiffs' symptoms. On the contrary, "the lapse of time which may exist between the time of negligent construction and eventual injury is a factor for the jury to consider in determining the causal connection between the negligence and the injury." *American Reciprocal Insurers v. Bessonette*, 235 Or. 507, 384 P.2d 223, 224

(1963) (en banc). In the *Jones, Otis* and *Okyiri* cases, we held that causation could reasonably be inferred where a single plaintiff incurred injury or other detriment soon after the conduct or event that was alleged to have been responsible. In those cases, each of which involved but one complainant, we held in effect that the trier of fact was not required to attribute to coincidence the proximity in time between conduct and its alleged consequences, but could fairly infer a causal relationship.

 On this score, the present case is far stronger for the plaintiffs. Here, many hundreds of employees who worked at the Waterside Mall reported symptoms similar to those experienced by the somatization plaintiffs. The results of the EPA survey, the testimony of Nurse Hogrefe, and the reports of the consultants all corroborate the frequency with which those who worked at EPA headquarters voiced the very complaints presented by the somatization plaintiffs.[13] The "logic" of the notion that there was no relationship between the contaminated air and the somatization plaintiffs' symptoms necessarily attributes to coincidence the common experiences of numerous employees. If there was no causation here, then the coincidence was even greater—indeed, much greater—than in the one-plaintiff cases we have cited. Viewing the evidence, as we must, in the light most favorable to the plaintiffs, we conclude that the jury could reasonably find that proximate cause had been proved. The trial judge therefore erred in granting JNOV against the somatization plaintiffs[14] on the issue of causation.[15]

13. Nurse Hogrefe remarked that "it's been over two years since I've been there, and it still has impact with me that we saw so many employees with similar type complaints."

14. Our reinstatement of the award in favor of the somatization plaintiffs, including Barbara Lively–Diebold, leads logically to similar relief for Robert Diebold for loss of consortium. We do not understand the defendants to argue to the contrary.

15. In support of their appeal, the plaintiffs also contend that they are entitled to a new trial on damages. They cite two evidentiary rulings by the trial judge. Neither contention warrants a new trial.

The plaintiffs sought to present testimony by Dr. Iris Bell regarding a theory known as "olfactory limbic kindling." Under that theory, long-term exposure to low levels of contaminants may cause permanent injury. The trial judge ruled (and Dr. Bell effectively ad-

## IV.

### THE DEFENDANTS' CROSS-APPEAL

In their cross-appeal, the defendants assert that the plaintiffs failed to prove negligence on the part of the defendants, and that the defendants are therefore entitled to judgment against all plaintiffs, including Ms. Watkins, the somatization plaintiffs, and Mr. Diebold. The defendants also claim that the physical injuries claimed by all employee-plaintiffs—successfully by Susan Watkins and unsuccessfully by the somatization plaintiffs—are not compensable under *Frye*. Both contentions are without merit.

### A. *Proof of negligence.*

The defendants claim that the plaintiffs' expert witnesses failed to provide precise data regarding the quantity of toxins to which the plaintiffs were exposed, and that these experts were unable to define with any precision the length of plaintiffs' exposure. The lack of such evidence, according to the defendants, undermined the plaintiffs' proof both as to negligence and as to causation. We disagree.

Irvin Fischer, an industrial hygienist who had initially been retained by the EPA to evaluate conditions at the Waterside complex, testified extensively about the specific chemicals and toxins utilized by the defendants during the renovation activity. Mr. Fischer stated that certain types of renovation always involve specific organic compounds and solvents. He explained that "[w]hen you're painting, all paints, basically have the same solvents. So, although you may not be able to identify what color paint was on the wall, you know that the solvent in the paint was basically the same."

Mr. Fischer studied Material Safety Data Sheets (MSDS) which were provided by the defendants or by the EPA, or which he obtained by filing his own Freedom of Information Act requests. The MSDS documents identified the specific substances that were used during the renovation process. According to Mr. Fischer, most of these substances were neurotoxins which operate as depressants to the central nervous system and which may cause loss of memory, breathing difficulties, unusual fatigue, and other neurological symptoms.

Mr. Fischer testified that the individual plaintiffs were in fact exposed to dangerously high levels of organic compounds, well in excess of "what has been clinically shown to cause neurological dysfunction with those exposures." In Mr. Fischer's opinion, the ventilation system at the Waterside Mall was inadequate and did not conform to accepted industry standards. After considering the proximity of the plaintiffs to the renovations, the limited extent to which the employees were segregated from this activity, and available information regarding the high incidence of neurological symptoms among the EPA

---

mitted) that the limbic kindling theory had not received "general acceptance," as required by *Frye v. United States*, 54 App.D.C. 46, 293 F. 1013 (1923). The judge therefore held that the evidence was inadmissible. The plaintiffs ask that we apply the standard of admissibility set forth in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). The *Frye* test remains in effect in this jurisdiction, however, *see, e.g., Nixon v. United States*, 728 A.2d 582, 588 (D.C.1999), *cert. denied,* —— U.S. ——, 120 S.Ct. 841, 145 L.Ed.2d 707 (2000), and a division of this court lacks the authority to supplant *Frye* with *Daubert* and

*Kumho Tire Co. See M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C.1971).

The plaintiffs also complain that David Smith, a defense witness, should not have been permitted to express the opinion that some of the employees' symptoms "reflected the characteristics of mass psychogenic illness." A trial judge has considerable discretion in determining whether opinion testimony from a lay witness should be admitted under all of the circumstances. *See, e.g., Finley v. United States*, 632 A.2d 102, 105–06 & n. 2 (D.C.1993), and authorities there cited. Assuming, *arguendo*, that Smith's characterization went beyond permissible bounds, we conclude, in light of the record as a whole, that any error was harmless.

employees, Mr. Fischer concluded that the defendants were in breach of the standard of care and that their negligence caused the plaintiffs' condition.

Professor James Woods, the plaintiffs' other principal witness regarding the issue of negligence, had conducted a detailed study of the Waterside complex, at the request of the EPA, before he was retained by the plaintiffs in this litigation. Dr. Woods told the jury, as we have seen, that the ventilation at the Waterside Mall was inadequate for everyday use, and was especially deficient during construction or renovation activity, and that this activity was conducted in an inefficient and haphazard fashion. As a result, according to Dr. Woods, the defendants violated the applicable standard of care and exposed the occupants of the buildings to dangerous chemical substances.

Both Mr. Fischer and Dr. Woods testified that, in their opinion, the defendants had endangered the health of EPA employees by conducting the renovations in a negligent manner. Although the plaintiffs were unable to offer testimony specifying the precise quantity or duration of exposure to particular substances, this did not render the expert testimony insufficient as a matter of law. On the contrary, precise data as to exposure are often unavailable,[16] but this does not preclude the presentation of a plaintiff's case to the jury.

■ Expert witnesses testifying in toxic exposure cases must frequently rely upon circumstantial data to support their conclusions. One court has held, and we agree, that

> where there are no facts, such as the exact degree of [plaintiff's] exposure ... the experts are still entitled to offer their conclusions based on their areas of expertise, the circumstantial evidence,

i.e. [plaintiff's] health before and after the accident, and the medical tests given [the plaintiff].

> The jury is then entitled to attach such weight as it finds [that] the expert testimony deserves.

*Wisner v. Illinois Cent. Gulf R.R.*, 537 So.2d 740, 748 (La.Ct.App.1988), *cert. denied*, 540 So.2d 342 (La.1989).

These authorities are consistent with this court's approach in comparable circumstances. In *District of Columbia v. Bethel*, 567 A.2d 1331 (D.C.1990), the District contended that certain expert testimony was insufficient because the materials on which the plaintiff's expert witness, James Murphy, relied did not establish negligence. We rejected the District's position:

> The District does not ... challenge Mr. Murphy's expertise. Rather, it contends in effect that his testimony was legally insufficient because, according to the District, he relied on improper materials to guide his expert opinion. The District cites no authority in support of its contention that a qualified expert's opinion can be undermined in this way. In general, although an opinion rises no higher than the level of the evidence and the logic on which it is predicated, it is for the jury, with the assistance of vigorous cross-examination, to measure the worth of the opinion.

*Id.* at 1333 (citations omitted).

■ Admissibility and sufficiency, of course, present different issues; an item of evidence may be relevant and admissible, but insufficient, standing alone, to support a finding of negligence. In this case, however, the plaintiffs presented detailed evidence by well-qualified expert witnesses. If credited, their testimony was quite compelling. Viewing the record in the light

---

16. Throughout the trial in this case, the experts for the plaintiffs testified that they lacked precise exposure data because the defendants had rigged air flow during diagnostic testing at the Waterside Mall. These claims, if credited, would permit a reasonable jury to find that the defendants themselves prevented the plaintiffs from ascertaining the precise level of toxic substances which were present at the Waterside Mall during its renovation.

most favorable to the plaintiffs, we conclude that the question of negligence was properly allowed to go to the jury.

B. *Compensable injury.*

The defendants also maintain on cross-appeal that the plaintiffs are not entitled to recover because, during closing argument, plaintiffs' counsel had characterized his clients' injuries as "Multiple Chemical Sensitivities" (MCS). According to the defendants, MCS is a "controversial" condition that has not been generally accepted in the relevant scientific and medical community, as required by *Frye*.[17] The defendants claim, in essence, that counsel's argument had the effect of conceding that the plaintiffs had no claim.

The jury having determined that the somatization plaintiffs suffered no physical injury at all, the question whether these plaintiffs would be entitled to any recovery if they were suffering from MCS is moot as to them. The issue remains live only as to Susan Watkins, who was awarded damages for a physical injury.

Viewing the record in the light most favorable to Ms. Watkins, we conclude that there was ample evidence to support the jury's award. We have previously dealt in some detail with the severity and duration of Ms. Watkins' symptoms. See pp. 933–34, *supra.* If the testimony of Ms. Watkins and her colleague, Vanessa Musgrave, is credited—and the jury evidently believed it—then one cannot plausibly assert that she sustained no legally cognizable harm. In addition, Ms. Watkins presented medical evidence showing that she suffered from toxic encephalopathy, *i.e.,* brain damage, surely a compensable injury. *See Berry, supra,* 709 So.2d at 554. According to Dr. Bell, a battery of tests, including an electro-encephalogram (EEG), disclosed that Ms. Watkins exhibited abnormal neurological functioning. Further tests administered by Dr. Thomas Callendar, a physician and occupational and environmental toxicologist, revealed that Ms. Watkins suffered from impaired balance, decreased grip strength, memory loss, chronic inflammation of the mucous membrane, and episodic tremors in her upper extremities. Dr. Callendar concluded that Ms. Watkins' exposure to toxic organic compounds had caused her to suffer from permanent toxic encephalopathy.

According to the defendants, the closing argument of counsel for the plaintiffs revealed that the plaintiffs' claim, in its entirety, was one for MCS and for nothing else. The defendants rely on the following passage:

> *Now what we're going to be talking about is something called multiple chemical sensitivity.* Everybody agrees in this case that the plaintiffs symptoms, all of them are real. That they were not faking. So it's one of two things, either it was brain damage or it was this thing called somatization. It doesn't make any difference whether they actually suffered brain damage or whether in their own mind they actually feel like this.

(Emphasis added.) Given the evidence of Ms. Watkins' toxic encephalopathy and comparatively serious injuries, we do not believe that the sentence italicized above can fairly be treated as an abandonment of her claim based on this compensable condi-

**17.** A diagnosis of MCS is premised upon the theory that "various kinds of environmental insults may depress a person's immune system so that the exposed person ... becomes hypersensitive to other chemicals and naturally occurring substances." *Frank v. State of New York,* 972 F.Supp. 130, 132 (N.D.N.Y. 1997) (internal quotation marks omitted). MCS cases present "a constellation of symptoms that some people believe are caused by exposure to low-molecular-weight organic chemicals at trace levels normally considered quite safe." Michael I. Luster et al., *Chemical Pollutants and "Multiple Chemical Sensitivities," in* Phantom Risk: Scientific Inference and the Law 379, 381 (Kenneth R. Foster et al. eds.1993). Expert testimony regarding MCS has been excluded by several courts. *See Frank, supra,* 972 F.Supp. at 137.

tion. Accordingly, we must sustain the jury's award in her favor.

## V.

### CONCLUSION

For the foregoing reasons, the judgment is affirmed in part and reversed in part. The case is remanded for further proceedings consistent with this opinion.

*So ordered.*[18]

STEADMAN, Associate Judge, concurring in part and dissenting in part.

As the majority points out, the plaintiffs' case in chief relied solely upon the allegation that all the plaintiffs had suffered permanent neurological injury as a result of the defendants' negligence. All of plaintiffs' experts focused on that theory alone. All of the defendant's experts understandably addressed their testimony to that theory of the plaintiffs.

Four of the plaintiffs now attempt to recover not for such actual neurological injury but rather for distinct somatization disorder allegedly caused by the defendants' negligence. To do so, they rely on snips and pieces of testimony drawn from the massive amount of expert testimony introduced first to propound and then to combat the neurological injury theory of plaintiffs' case. I do not think this suffices where expert testimony is at issue.

It is undisputed that the negligence, proximate cause, and injury elements of this litigation all depended upon expert testimony. The issues were technical and complex. "[I]n cases presenting medically complicated questions ... we have held that expert testimony is required on the issue of causation." *Williams v. Patterson,* 681 A.2d 1147, 1150 (D.C.1996) (quoting *Baltimore v. B.F. Goodrich Co.,* 545 A.2d 1228, 1231 (D.C.1988)) Indeed, the factual issues relevant to plaintiffs' claims crossed several disciplines and plainly were "so distinctly related to some science, profession, or occupation as to be beyond the ken of the average layperson." *Messina v. District of Columbia,* 663 A.2d 535, 538 (D.C.1995) (quoting *District of Columbia v. Peters,* 527 A.2d 1269, 1273 (D.C. 1987)). A jury verdict founded on something other than the opinions of experts would be patently unreasonable. *Travers v. District of Columbia,* 672 A.2d 566, 568 (D.C.1996) ("The purpose of expert opinion testimony is to avoid jury findings based on mere speculation or conjecture.") (quoting *Washington v. Washington Hosp. Center,* 579 A.2d 177, 181 (D.C.1990)).

While ordinarily it is within the province of a jury to pick and choose among the evidence that it hears on the basis of its common sense and experience, I think that given the nature of expert testimony, the same freedom cannot be uncritically admitted.[1] On the contrary, I think that to prevail, the party whose case is dependent

---

**18.** We reiterate that the belated introduction into the trial of issues relating to the causation and compensability of somatoform disorder created a situation in which the case was decided in part on the basis of a record in which the parties did not focus upon these issues. In holding that JNOV was erroneously granted against the somatization plaintiffs, we express no opinion as to whether the defendants would have been entitled to a new trial if they had asked for one.

**1.** Let me venture a crude and perhaps imperfect example. Suppose for example the time is 1620 and the issue is whether the earth is the center of the universe and the sun (like the planets and stars) moves around it in a celestial sphere, rising and setting once each day (the Ptolemaic theory of the universe), or instead the sun is the center of the universe and the earth revolves around the sun, the apparent rising and setting of the sun due to the earth's rotation on its axis (the Copernican view). It would not do to permit a jury to conclude that the earth was indeed the center of the universe but the apparent rising and setting of the sun was due to the earth's daily rotation on its axis, a physical state of affairs to which no expert had testified.

I do not question that in general a jury is free to accept or reject expert testimony and give it as much weight as it deserves. But this is a different proposition from that which I address here.

upon expert evidence must place before the jury a coherent, logically connected chain of expert testimony to establish the case. It may be that the plaintiff can make his case at least in part through experts tendered by the defense, but the totality of expert testimony must be sufficiently extensive and coherent so that one can reasonably say that there is an expert (or group of experts) who have directly addressed the disputed matters and testified that the elements at issue of plaintiff's case have been established under sound scientific principles. I am unable to conclude that with respect to the claimed somatization injuries and their cause, this chaotic and spasmodic record in that regard satisfies that standard.[2] *Cf. Lasley, supra*, 688 A.2d at 1387 (with expert testimony only on a condition, the procedure, and the injury, but not on causation, "a lay jury could not have pinpointed the cause of Lasley's [injury] without blindly guessing"); *Herbert v. District of Columbia*, 691 A.2d 1175, 1184 (D.C.1997) (affirming directed verdict because in the absence of expert testimony regarding "a subject with which the average lay person would not be familiar[,] ... the jury was necessarily incapable of determining whether any breach occurred"), *vacated in part on other grounds*, 716 A.2d 196 (D.C.1998) (en banc).

I agree with my colleagues, however, in sustaining the judgment in favor of Susan Watkins, whose claim of actionable physical injury was supported by cohesive and focused expert testimony.

---

**2.** The majority's reliance on the sequence of events appears unavailing to me here. Given the extreme complexities and risks of error in distinguishing correlation and temporal sequence from causation, recognized in the majority opinion, I do not think that factor can bolster expert testimony except to the extent that the expert himself or herself testifies to its relevance to the issue at hand.